THE STATE OF OHIO, APPELLANT, *v.* BUEHLER, APPELLEE.

[Cite as *State v. Buehler,* 113 Ohio St.3d 114, 2007-Ohio-1246.]

(No. 2005–2336—Submitted November 15, 2006—Decided April 4, 2007.)

O'DONNELL, J.

{¶ 1} We are asked in this appeal to determine whether the DNA testing procedures established in R.C 2953.71 through 2953.84 require a trial court to order the prosecuting attorney to prepare and file a DNA evidence report in every instance, despite a showing that a specific DNA test result may not be

outcome-determinative in a given case. The facts of this request date back to a murder committed in Cuyahoga County more than 20 years ago.

{¶ 2} On April 26, 1985, South Euclid police officers discovered the bludgeoned body of Joan O'Brien in the attic of her East Berwald Street home. Thereafter, a Cuyahoga County grand jury returned indictments against Paul Buehler and Rodney Hedrick, charging each of them with one count of aggravated murder and one count of aggravated robbery. The state prosecuted the cases separately.

{¶ 3} According to testimony from Buehler's trial, O'Brien had rented a portion of her home to Hedrick, in exchange for his agreement to perform various chores around her house as payment for his leased room. In April 1985, Hedrick invited Buehler, a student at Brush High School, to rent unused attic space in O'Brien's home. Although Buehler met with O'Brien on the morning of April 22, it is unclear whether he obtained permission to move into the attic; nonetheless, on the morning of Thursday, April 25, after O'Brien left for work, Buehler moved his possessions into her home.

{¶ 4} What occurred thereafter is disputed. At trial, the state presented the testimony of Hedrick, who indicated that O'Brien confronted Buehler in her attic that evening concerning his presence in her house and demanded that he move out. An argument ensued between them. Hedrick testified that he went to the attic, that Buehler was restraining O'Brien, and that Buehler demanded that Hedrick "pick up the hammer and hit her." Hedrick testified that he grabbed a rubber mallet from a nearby chest and hit O'Brien in the head several times until she appeared stunned. After O'Brien slumped to the floor, Buehler grabbed the mallet and repeatedly struck her in the head. According to Hedrick, the entire episode took "[n]o more than five or ten minutes." The deputy county coroner testified that O'Brien had visible injuries on her hands indicative of self defense, and a serologist testified that blood-spatter analysis indicated that two people in addition to the victim were present in the attic at the time of the crime.

{¶ 5} Buehler, however, testified differently. He stated that he had attended a seminar at Sea World from approximately 6:00 p.m. to 10:30 on the evening of April 25 and that he and Hedrick had gone to a bar in Cleveland until approximately 4:30 a.m. Buehler added that he fell asleep in Hedrick's room instead of the attic because he was light-headed from drinking and that he had not been in the attic since leaving for Sea World on Thursday, April 25, 1985, and awakening in Hedrick's room the next day, Friday, April 26, 1985. Accordingly, Buehler claimed that because he had not been in the attic when the murder occurred, he could not be guilty of the aggravated murder of Joan O'Brien.

{¶ 6} The record further reveals that on the evening of April 26, 1985, Hedrick and Buehler fled to West Virginia in O'Brien's car and that local police there apprehended them approximately two days later. Detective James Pitten and

Lieutenant James Farrell of the South Euclid Police Department traveled to West Virginia to transport Buehler and Hedrick back to Ohio on April 30, 1985. After searching O'Brien's car, police recovered a television set and a jug of money belonging to O'Brien. As a result, a grand jury indicted Buehler for the aggravated murder and aggravated robbery of Joan O'Brien, and the court thereafter tried the case to a jury.

{¶ 7} On December 20, 1985, the jury returned a verdict finding Buehler guilty of both the aggravated murder and the aggravated robbery of Joan O'Brien, and the Eighth District Court of Appeals affirmed his conviction and sentence on direct appeal. *State v. Buehler* (Jan. 29, 1987), Cuyahoga App. No. 51522, 1987 WL 4742. Buehler filed a subsequent application to reopen the appeal pursuant to App.R. 26(B) in 1998, which the court of appeals denied. *State v. Buehler* (Mar. 27, 1998), Cuyahoga App. No. 51522, 1998 WL 158866.

### The Instant Appeal

{¶ 8} On October 29, 2004, Buehler filed an application for DNA testing with the trial court in accordance with R.C. 2953.73, arguing that Hedrick had committed the offense and that a test of material retrieved from under O'Brien's fingernails would reveal only Hedrick's DNA. The state urged that even if the DNA test result excluded Buehler's DNA, it would not be outcome-determinative. The trial court denied the application, finding that "DNA evidence that might indicate only biological material of Hedrick on deceased's person would be consistent with the state's theory and evidence in the case, and thus not outcome determinative." Buehler appealed that determination to the court of appeals.

{¶ 9} The appellate court, in a split decision, reversed the judgment of the trial court and held that R.C. 2953.74(C) requires a trial court to follow the mandates of R.C. 2953.74, 2953.75, and 2953.76. *State v. Buehler*, 164 Ohio App.3d 209, 2005-Ohio-5717, 841 N.E.2d 831, ¶ 17–18. In reaching its conclusion, the appellate court examined the language of R.C. 2953.75 and 2953.76, which provides that upon the filing of an application, the trial court "shall" order the prosecuting attorney to ascertain the existence of material that can be tested without destroying the parent sample, prepare a report regarding that material, and establish chain of custody of the sample.

### The Certified Conflict

{¶ 10} Because its decision conflicted with a separate opinion of the Ninth District Court of Appeals on the same subject in *State v. Wilkins*, 163 Ohio App.3d 576, 2005-Ohio-5193, 839 N.E.2d 457, ¶ 7, which held that R.C. 2953.74 through 2953.81 should be read sequentially, permitting a trial court to deny an application for DNA testing if the test would not be outcome-determinative, the Eighth District Court of Appeals certified the following question to us for

consideration: "Must a trial court read R.C. 2953.74 sequentially so that an eligible inmate seeking a DNA test must first meet the outcome determinative criteria set forth in R.C. 2953.74(B)(1) or (B)(2) before a court considers R.C. 2953.74(C) and requires a prosecutor report as provided in R.C. 2953.75?" We determined that a conflict existed and ordered the parties to brief this issue of statutory construction. 108 Ohio St.3d 1411, 2006-Ohio-179, 841 N.E.2d 316.

{¶ 11} Specifically, this case centers upon R.C. 2953.74(B) and (C) and also implicates R.C. 2953.75. The relevant portions of R.C. 2953.74 state:

{¶ 12} "(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:

{¶ 13} "(1) The inmate did not have a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, [and] the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section *would have been outcome determinative at that trial stage in that case* * * *.

{¶ 14} "(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate * * *, and the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.

{¶ 15} "(C) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if all of the following apply:

{¶ 16} "(1) The court determines pursuant to section 2953.75 of the Revised Code that biological material was collected from the crime scene or the victim * * * and * * * that the parent sample of that biological material against which a sample from the inmate can be compared still exists at that point in time.

{¶ 17} "(2) The testing authority determines all of the following pursuant to section 2953.76 of the Revised Code regarding the parent sample of the biological material described in division (C)(1) of this section:

{¶ 18} "(a) The parent sample of the biological material so collected contains scientifically sufficient material to extract a test sample.

{¶ 19} "(b) The parent sample of the biological material so collected is not so minute or fragile as to risk destruction of the parent sample by the extraction described in division (C)(2)(a) of this section * * *.

{¶ 20} "(c) The parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing * * *.

{¶ 21} "* * *

{¶ 22} "(5) The court determines that, if DNA testing is conducted and an exclusion result is obtained, the results of the testing will be outcome determinative regarding that inmate." (Emphasis added.)

{¶ 23} R.C. 2953.75 states:

{¶ 24} "(A) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court *shall* require the prosecuting attorney to use reasonable diligence to determine whether biological material was collected from the crime scene or victim of the offense * * * and whether the parent sample of that biological material still exists at that point in time. * * *

{¶ 25} "* * *

{¶ 26} "(B) The prosecuting attorney *shall* prepare a report that contains the prosecuting attorney's determinations made under division (A) of this section and *shall* file a copy of the report with the court and provide a copy to the eligible inmate and the attorney general." (Emphasis added.)

### Views of the Parties

{¶ 27} In arguing for a sequential reading of these code sections, the state contends that if a trial court first determines pursuant to R.C. 2953.74(B)(1) and 2953.74(C)(5) that a DNA test result would not be outcome-determinative, it need not make the remaining determinations set forth in R.C. 2953.74(C) or require the prosecuting attorney to prepare a report pursuant to R.C. 2953.75. This is significant because R.C. 2953.74(B)(1) specifies that a trial court may grant an application for such testing only if an exclusion result would be outcome-determinative.

{¶ 28} Buehler, by way of contrast, maintains that because R.C. 2953.74(C) and 2953.75 contain mandatory language, a trial court is obligated to require the prosecuting attorney to prepare and file a DNA evidence report each time an eligible inmate files a DNA application *regardless* of whether the test would be outcome-determinative.

### Consideration of R.C. Chapter 2953

{¶ 29} We begin by reiterating that related sections of the Revised Code must be construed together, *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health,* 96 Ohio

St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 28–29, and that in cases of statutory construction, "our paramount concern is the legislative intent in enacting the statute." *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21. Furthermore, "in determining this intent, we first review the statutory language, reading words and phrases in context and construing them according to the rules of grammar and common usage." Id., citing *State ex rel. Rose v. Lorain Cty. Bd. of Elections* (2000), 90 Ohio St.3d 229, 231, 736 N.E.2d 886.

{¶ 30} The statutory scheme here precludes a trial court from accepting an application for DNA testing unless an eligible inmate can show, in cases where the inmate did not have DNA testing at trial, that an exclusion result would be outcome-determinative. Also, the court is directed to require the prosecuting attorney to prepare and file a report regarding the existence of DNA evidence. The statutes, however, are silent as to the sequence in which a court is to apply them in a given case.

{¶ 31} Because the statutes do not prioritize the obligations imposed for considering an application for DNA testing, they vest considerable discretion and wide latitude with the judiciary upon the filing of such an application. We further recognize that these statutes are not ambiguous and are not in conflict. For example, if a trial court decided that a DNA test exclusion result would not be outcome-determinative, the court would have no obligation to accept the application and would have no need for a prosecuting attorney to prepare and file a DNA evidence report pursuant to R.C. 2953.75. On the other hand, if the court knows or determines that DNA material had been collected from the crime scene but that the parent sample is no longer available for testing, that determination would moot the issue of whether the test result would be outcome-determinative. It is therefore apparent that a trial court should exercise its discretion in determining its best course of action when considering an application for DNA testing in an effort to best utilize judicial resources. The decision on how to proceed is left to the court's discretion.

{¶ 32} This legislative intent is also apparent in other sections of the DNA-testing statutes. R.C. 2953.72(A)(4) requires an inmate requesting DNA testing to acknowledge that "the state has established *a set of criteria set forth in section 2953.74* of the Revised Code by which eligible inmate applications for DNA testing *will be screened* and that a judge of a court of common pleas upon receipt of a properly filed application and accompanying acknowledgement will apply those criteria to determine whether to accept or reject the application." (Emphasis added.) Further, R.C. 2953.73(D) states that a trial court "shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to

the proceedings against the applicant * * * *unless the application and the files and records show the applicant is not entitled to DNA testing, in which case the application may be denied.*" (Emphasis added.) Notably, R.C. 2953.73(D) *specifically refers to* the situation in which a court need not consider all submitted materials when an inmate files an application if the application cannot be accepted on its merits.

{¶ 33} A careful, commonsense reading of R.C. 2953.74(C) in pari materia with R.C. 2953.72 and 2953.73 and the remainder of R.C. 2953.74 illustrates the intent of the General Assembly to authorize the trial court to exercise its discretion in how to proceed when ruling on an eligible inmate's application for DNA testing.

{¶ 34} Buehler's argument to the contrary ignores the remainder of the DNA-testing statutes as well as the basic principle that "[a] court will not perform a vain act when there is no real issue presented * * *." *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 18; *Gerhold v. Papathanasion* (1936), 130 Ohio St. 342, 346, 4 O.O. 425, 199 N.E. 353 ("the law does not require the performance of a vain act"). It makes little sense, therefore, to require both the trial court and the prosecuting attorney to act in conformity with R.C. 2953.74(C) and 2953.75 when R.C. 2953.74(B)(1) precludes acceptance of the eligible inmate's application in the first instance if the test result would not be outcome-determinative.

{¶ 35} The dissenting opinion in this case misconstrues our syllabus language in that it suggests an invention of judicial discretion. Nothing could be more distant from reality. " 'In the construction of statutes the purpose in every instance is to ascertain and give effect to the legislative intent * * *.' " *Weaver v. Edwin Shaw Hosp.*, 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 12, quoting *Carter v. Youngstown Div. of Water* (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63, paragraph one of the syllabus. Here, the legislature has dictated two duties to the trial courts of this state but has failed to sequence the order in which trial judges are to address these duties. Our holding suggests nothing about one portion of a statute trumping another or that a court is permitted to ignore a statutory mandate. The reality is that trial judges are vested with authority to exercise their discretion in the discharge of statutory duties. That is the holding of this case and the import of the language in the syllabus.

{¶ 36} We therefore answer the certified question as follows: When an eligible inmate files an application for DNA testing pursuant to R.C. 2953.73, a trial court should exercise its discretion based upon the facts and circumstances presented in the case as to whether it will first determine whether the eligible inmate has demonstrated that the DNA testing would be outcome-determinative or whether it should order the prosecuting attorney to prepare and file a DNA evidence report pursuant to R.C. 2953.75.

{¶ 37} In this case, the state maintained at trial that Hedrick first struck O'Brien in the head with the rubber mallet and that he did so until she became stunned. Though Hedrick testified that Buehler and O'Brien struggled before Hedrick initially hit her with the mallet, that fact would not necessarily mean that Buehler would have left his DNA beneath her fingernails. Furthermore, this testimony is consistent with the state's position that Buehler did not strike O'Brien with the mallet until *after* she had been stunned. Thus, a DNA test result excluding Buehler would be consistent with the state's position at trial, i.e., that Hedrick was the initial assailant and that O'Brien attempted to defend herself against Hedrick's initial blows with the hammer after struggling with Buehler. That DNA test result, in view of the independent evidence of Buehler's guilt from Hedrick's testimony at trial regarding his participation in the murder, the testimony from a serologist as to the presence of two persons in addition to the victim at the time of the crime from the blood-spatter pattern, Buehler's flight to West Virginia with Hedrick in O'Brien's car, and the theft of her television and money, would not prevent a reasonable factfinder from reaching a guilty verdict. A DNA test result excluding Buehler, therefore, would not be outcome-determinative. Accordingly, the trial court did not abuse its discretion in denying the application on this basis.

{¶ 38} For these reasons, we reverse the decision of the Eighth District Court of Appeals and reinstate the judgment of the trial court.

Judgment reversed.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

HARSHA, J., concurs in judgment only.

LANZINGER, J., dissents.

WILLIAM H. HARSHA, J., of the Fourth Appellate District, was assigned to sit for RESNICK, J., whose term ended on January 1, 2007.

CUPP, J., whose term began on January 2, 2007, did not participate in the consideration or decision of this case.

---

**HARSHA, J., concurring in judgment only.**

{¶ 39} Contrary to the conclusion of both the principal opinion and the dissent, I find that the statutory scheme is ambiguous. While the language of each section may seem plain when read in isolation, it becomes ambiguous when read as a whole. It is the statutory scheme's lack of guidance concerning the priority of its application that makes it ambiguous. Because the ambiguity exists, the statutes are rightly subject to construction by this court. *State v. Hairston,* 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 11.

{¶ 40} When construing statutes, courts should read them as a whole, *State v. Wilson* (1997), 77 Ohio St.3d 334, 336, 673 N.E.2d 1347, avoid reaching absurd results, R.C. 1.47(C), and refrain from mandating other tribunals to perform vain acts, *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 18.  Thus, I conclude that the proper reading of the statutory scheme elevates the outcome-determinative requirement of R.C. 2953.74(B)(1) to threshold status.  Because the General Assembly would not intend the trial court to perform a vain act, thereby squandering scarce judicial resources, I conclude that the General Assembly intended the statute to be applied sequentially.  Then, if the court determines that the test results would be outcome-determinative, it must ("shall") order the prosecutor to prepare the report required by R.C. 2953.75(A).

{¶ 41} Thus, I concur in judgment only.

---

**LANZINGER, J., dissenting.**

{¶ 42} I dissent from the holding that when an inmate submits an application for DNA testing, a court has the discretion to initially decide that a DNA test will not be outcome determinative, thus obviating the prosecutor's obligation to check for the existence and condition of biological material.  This reading conflicts with mandatory language that "[i]f an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court *shall require* the prosecuting attorney to use reasonable diligence to determine whether biological material was collected * * * and whether the parent sample of that biological material still exists * * *."  (Emphasis added.)  R.C. 2953.75(A).

{¶ 43} R.C. 2953.72(A)(2) explains that "the process of conducting postconviction DNA testing * * * begins when the inmate submits an application under section 2953.73 of the Revised Code and the acknowledgment described in this section."  The key event therefore is a request made pursuant to the statute.

{¶ 44} Within the provisions for DNA testing, the General Assembly distinguished actions that happen immediately upon submission of an application from those that occur only after the submission is accepted by the court, and also from those that occur after the submission is accepted and DNA testing is to be performed.  The unqualified phrase "If an eligible inmate submits an application for DNA testing" is used nine times in R.C. 2953.71 through 2953.83 and prefaces the need for immediate action on the part of the court, the inmate, or the

prosecutor when the application is filed.[1] Both sections that refer to the prosecutor's duties begin with these words.[2] In other places, however, the introductory language is qualified. One section calls for action when the test request is submitted and accepted by the court,[3] while three others limit action until the court determines that DNA testing actually is to be performed.[4] This is the only sequencing provided in R.C. 2953.71 through 2953.81.

{¶ 45} The holding of the majority opinion announces that the trial court has discretion to choose the order in which it exercises its statutory duties. Paragraph two of the syllabus states that a trial court "should exercise its discretion based upon the facts and circumstances presented in the case as to whether it will first determine whether the eligible inmate has demonstrated that the DNA testing would be outcome-determinative, or whether it should order the prosecuting attorney to prepare and file a DNA evidence report pursuant to R.C. 2953.75." This discretion is judicially created and is conferred nowhere in the statute. It is improper to suggest that the court has discretion when the General Assembly has already demonstrated the ability to authorize discretion when it so desires.[5]

{¶ 46} The majority also views the issue of whether testing will be outcome determinative as one that trumps the state's immediate duty to check for the existence and condition of any biological material that may contain DNA. However, the existence of the material itself may relate to whether "there is a strong probability that no reasonable factfinder would have found the inmate guilty." R.C. 2953.71(L).

{¶ 47} I do not agree that the trial court has discretion to ignore mandatory language of R.C. 2953.75 and 2953.76, which set forth prosecuting attorneys' duties. If the General Assembly had intended that the criteria of R.C. 2953.74(B)

---

1. R.C. 2953.73(D) begins, *"If an eligible inmate submits an application for DNA testing* under division (A) of this section, the court *shall* make the determination as to whether the application should be accepted or rejected." (Emphasis added.)

2. R.C. 2953.75 and 2953.76.

3. "If an eligible inmate submits an application for DNA testing under *section 2953.73 of the Revised Code* and *the court accepts the application* * * *." (Emphasis added.) R.C. 2953.74(E).

4. "If an eligible inmate submits an application for DNA testing under *section 2953.73 of the Revised Code and if the application is accepted and DNA testing is to be performed* * * *." (Emphasis added.) R.C. 2953.77(A), 2953.78(A), and 2953.79(A).

5. For example, R.C. 2953.74(A) states, "If an eligible inmate files an application for DNA testing and a prior inconclusive DNA test has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall review the application *and has the discretion, on a case-by-case basis, to either accept or reject the application.*" (Emphasis added.)

should be met before requiring the court to order the prosecutor to issue a report, it could have done so. Instead, R.C. 2953.75(A) states that "the court *shall require* the prosecuting attorney to use reasonable diligence to determine whether biological material was collected from the crime scene or victim of the offense." (Emphasis added.) Use of the word "shall" does not allow for the court's discretion. "Shall" is mandatory.

{¶ 48} While the majority decision reaches a result that may seem preferable, it is not what the statutes provide. I would answer no to the certified question; R.C. 2953.74 and 2953.75 are not to be read "sequentially."

_____

William D. Mason, Cuyahoga County Prosecuting Attorney, and Mary H. McGrath, Assistant Prosecuting Attorney, for appellant.

David H. Bodiker, Ohio Public Defender, and James R. Foley, Assistant State Public Defender, for appellee.