[Cite as *State v. Emerick*, 2011-Ohio-5543.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                :

    Plaintiff-Appellee                   :         C.A. CASE NO.    24215

v.                                           :         T.C. NO.    94CR1548

EDMUND E. EMERICK, III              :            (Criminal appeal from
                                                              Common Pleas Court)
    Defendant-Appellant               :

                                             :

· · · · · · · · · ·

## O P I N I O N

Rendered on the   28th   day of   October  , 2011.

· · · · · · · · · ·

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARK GODSEY, Atty. Reg. No. 0074484, Ohio Innocence Project, P. O. Box 210040, University of Cincinnati College of Law, Cincinnati, Ohio 45221
      Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

{¶ 1} Edmund E. Emerick appeals from a judgment of the Montgomery County Court of Common Pleas, which denied his motion for further DNA testing. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and

remanded for further proceedings.

I

{¶ 2} In 1996, Emerick was indicted for one count of aggravated robbery and two counts of aggravated murder, with death penalty specifications, arising out of the killings of Robert Knapke and Frank Ferraro during a robbery of the Sloopy's bar in Dayton. According to the coroner, Knapke and Ferraro died from blunt-force injuries to their heads, consistent with blows from a hammer. The police discovered that a safe and a two-wheeled dolly were missing from the bar, and that a cigarette vending machine in the bar had been broken into.

{¶ 3} At trial, the State presented eyewitness testimony that Emerick had been outside of Sloopy's around 11:00 a.m. on March 19, 1994, the day the crimes were committed. Other witnesses testified that Emerick, a former manager of another bar located approximately one block from Sloopy's, had previously been in the office area of Sloopy's, where the safe was located. The dolly and the safe were located near businesses that Emerick frequented in another area of Dayton; a dolly was found behind a laundromat after Emerick came to retrieve his laundry, and the safe was located near a nearby hardware store. A handwritten letter about the crime, allegedly written by the perpetrator, was mailed to a local television station approximately one week after the murders; an FBI handwriting expert testified that it was "extremely likely" that the letter was prepared by Emerick. Two tool mark examiners testified that tool marks found on the cigarette machine matched the tire iron located in Emerick's car. A man who had been in jail with Emerick after his arrest testified that Emerick had stated that he wished that he had taken the murder weapon with

him and other incriminating statements.

{¶ 4} Numerous blood samples were collected from the men's bathroom and the middle/food preparation room at Sloopy's, where Ferraro and Knapke were killed, respectively. These items, in addition to a claw hammer, the tire iron, and carpet from Emerick's car, were tested for blood type (ABO) and PGM enzyme type. Blood was also found on Emerick's left shoe and jacket; these items were sent to an independent laboratory for DNA testing. A former forensic scientist with the Miami Valley Regional Crime Lab testified that no blood was found on the tire iron. Although the carpet had blood on it, the species could not be determined. One blood sample from a wall showed a blood type of AB, which differed from the victims, but the other blood evidence was consistent with having come from the victims. There was no testimony regarding Emerick's blood type. The results of the DNA testing of Emerick's clothing were inconclusive. No DNA evidence linking Emerick to the murders of Knapke and Ferraro was presented at trial.

{¶ 5} The jury found Emerick guilty of all charges and specifications and recommended life in prison. The trial court sentenced him accordingly. We affirmed Emerick's convictions on direct appeal. *State v. Emerick* (June 6, 1997), Montgomery App. No. 15768 ("*Emerick I*").

{¶ 6} On October 28, 2005, Emerick filed an application for post-conviction DNA testing with the trial court, seeking to test: (1) the hammer; (2) fingernail clippings; (3) blood tins; (4) screwdriver bits; (5) paper towels and cloth towels; (6) vials of blood; (7) carpet from his automobile; (8) his clothing; and (9) hair samples. Emerick asserted that "DNA testing could be conclusive proof of innocence, particularly if a match was made on different

items that was not the DNA profile of either victim (for example, a match between the hammer & DNA collected from fingernail clippings). Further, DNA could prove who was the real murderer. ***"

{¶ 7} In February 2006, the trial court overruled Emerick's application for post-conviction DNA testing. The trial court held that DNA testing was generally accepted and available in 1996. Thus, Emerick's application "fails under [R.C.] 2953.74(B)(1) because all biological material that he wishes to test was available for testing at the time of trial." The trial court further noted that Emerick's clothing had been tested and an "inconclusive" test result had been obtained; it concluded, however, that any additional DNA testing of that evidence would not be outcome determinative of a not-guilty finding at trial.

{¶ 8} Emerick appealed the trial court's denial of his application. He argued that he should have been allowed to test the following items for DNA: (1) fingernail scrapings of the victims, (2) swabs of blood taken from the bathroom wall in Sloopy's, (3) genetic material on the hammer and screwdriver bits used to murder Knapke and Ferraro, (4) blood stains found on Emerick's jacket cuff and shoe, and (5) stains on the carpet of Emerick's motor vehicle. (These items represented many, but not all, of the evidentiary materials included in Emerick's application; for example, Emerick did not focus on the paper towels on appeal.) Emerick claimed that if these items were to be tested for DNA, the results would demonstrate the presence of a third unknown person at the crime scene. Emerick further asserted that DNA testing of the genetic material would effectively demonstrate that he was not present at the bar when the murders were committed, and thus, could not have

been the perpetrator of the crimes.

{¶ 9} On October 10, 2006, while his appeal of the trial court's denial of DNA testing was pending, Emerick filed a second application for DNA testing. In his second application, Emerick requested DNA testing of the same biological material that was listed in the first application, namely the "hammer; victims' fingernail clippings; blood tins; vials of blood; screw driver bits; paper and cloth towels; automobile carpet; clothing; [and] hair samples." His supporting memorandum argued that Short Tandem Repeat ("STR") DNA testing "is capable of excluding Emerick as the source of the biological materials and establishing his innocence of the crime. If Mr. Emerick is in fact excluded through DNA testing, the test results could be used to identify the true perpetrator of the crime."

{¶ 10} On March 23, 2007, prior to the trial court's ruling on Emerick's second application, we reversed the trial court's February 2006 decision. *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334 ("*Emerick II*"). We noted that Y-Chromosome Short Tandem Repeat ("Y-STR") DNA Analysis was not available at the time of Emerick's trial and that the development of Y-STR technology was partially responsible for the General Assembly's decision to enact R.C. 2953.71 through 2953.83, so that otherwise qualified inmates would have the opportunity to take advantage of advances in technology that were not available at the time of their trials. We stated that "Emerick's case falls squarely under that category." Id. at ¶18.

{¶ 11} We further held that the DNA testing would be outcome determinative, reasoning:

{¶ 12} "The state's theory at trial was that the offenses which took place at Sloopy's

on the day in question were committed by a single perpetrator. There was no DNA evidence that placed Emerick at the scene of the crime, and he maintained his innocence throughout the trial. He contends that DNA testing of the fingernail scrapings of the victims, the swabs of blood on the bathroom walls, and the genetic material on the murder weapons will demonstrate the existence of a third party at the crime scene whose DNA does not match Emerick's or that of the two victims. Emerick argues that if the genetic material does not match his DNA or that of the victims, then the isolated DNA must belong to another donor. If the unidentified donor's DNA is located on different evidentiary items, that individual would be the actual murderer. Under this scenario, DNA analysis of the requested evidentiary items would clearly be outcome determinative with respect to the question of Emerick's guilt. The existence of a third party who committed the murders and robbery would exonerate Emerick. Thus, pursuant to R.C. 2953.74(B)(2), Emerick is entitled to Y-STR DNA analysis of the identified evidentiary items." Id. at ¶25.

{¶ 13} In October 2007, the prosecutor filed a report, pursuant to R.C. 2953.75, which identified the following biological materials as still existing: (1) screwdriver bit recovered from in front of a cigarette machine; (2) fingernail clippings; (3) stain from the bathroom wall; (4) sample from the hammer; (5) sample from the jacket cuff; (6) sample from the shoe; and (7) sample from the carpet. The screwdriver bit and fingernail clippings were retained in the court's property room. The other items were retained by the Miami Valley Regional Crime Lab. The report did not mention biological materials other than those ordered to be tested in *Emerick II*, and it is unclear whether the prosecutor looked for any additional biological evidence, as required by R.C. 2953.75.

{¶ 14} Pursuant to our judgment, the items addressed in our opinion (and itemized by the prosecutor in the Prosecutor's Report) were sent to an independent laboratory for Y-STR DNA testing. Emerick and Ferraro's DNA was excluded from the fingernail clippings, wall sample, and hammer handle; Knapke's DNA could not be excluded as the source of the blood for those samples. Emerick's DNA was excluded from the hammer whereas both Ferraro's and Knapke's DNA could not be excluded. Ferraro and Knapke were excluded as the source of the blood on Emerick's jacket; Emerick was not excluded as the source of that blood. Emerick, Ferraro, and Knapke were excluded as sources of the DNA on Emerick's shoe. No male DNA was located on the screwdriver tip, and no human DNA was found on the automobile carpet. Emerick has acknowledged that "[t]esting thus far has failed to yield definitive evidence of Defendant's innocence or guilt." (Doc. #15.)

{¶ 15} On March 13, 2009, Emerick filed a motion for further DNA testing and to compel the prosecutor to provide a report listing all biological material collected in the case. He argued that "DNA testing of the remaining items would likely turn up additional profile that would exculpate Emerick in this case." In particular, Emerick sought testing of the so-called "devil letter," which was purportedly sent from the killer to the media shortly after the murders/robbery, as well as paper towels found in both the men's and ladies' restrooms and a Budweiser beer bottle found inside the walk-in cooler in the middle room of the bar. Emerick stated that there were more than 20 additional items that had never been tested for DNA, such as (1) blood taken from the cooler in the middle room; (2) blood taken from the men's room sink; and (3) blood taken from the wall of the men's room near the toilet paper dispenser. Emerick also sought an order to require the State to inventory all

biological material, which the State allegedly had never done.

{¶ 16} The State opposed Emerick's motion for additional testing. The State argued that Emerick had "not even attempted to demonstrate the reasonableness of testing *every single item of evidence*, and [had] not specifically identified what items' test results could exculpate him." (Emphasis in original.) (Doc. #19.) The State further argued that results excluding Emerick as a contributor of biological material on the additional items would not exonerate him.

{¶ 17} A hearing on Emerick's motion was held in July 2009, and the parties submitted post-hearing memoranda. For the most part, the parties repeated their previously asserted arguments. In his post-hearing memorandum, Emerick also asserted that the law of the case doctrine governed this matter. He claimed that the appellate court (this court) had previously concluded that DNA testing would be outcome determinative and that the trial court was bound to follow that holding. The State responded that the law of the case doctrine did not apply, because Emerick's motion for further testing concerned different biological evidence.

{¶ 18} The trial court denied Emerick's motion for further post-conviction DNA testing. The court rejected Emerick's contention that the law of the case doctrine applied. The court noted that it had already followed the mandate in *Emerick II*, and that the appellate opinion and judgment were confined to eight pieces of evidence. The court further found that Emerick had made the strategic decision not to test additional items at the time of trial, when DNA testing was generally available. Further, the court found that additional testing would not be outcome determinative. The trial court stated, in part:

{¶ 19} "Defendant's theory that DNA testing could produce an outcome determinative result is problematic because it only can prove to be true IF the evidence at trial is found not to be credible AND the DNA testing of the 'devil letter' reveals an additional profile AND that profile happens to be found on any of the other evidence tested AND all the other profiles found on all other evidence exclude Defendant. At best, finding a new DNA profile would simply attack the credibility of evidence presented rather than produce an outcome determinative result. The Court reminds Defendant that the murders took place in the hours following two very busy nights at the bar. Finding DNA from another person on paper towels or beer bottles in a bar, or even the walls of a public bar, would not definitively exclude Defendant as the murderer. Further, with respect to the 'devil letter,' a DNA profile of someone other than Defendant could simply mean that Defendant wrote the letter, but someone else handled it and sealed the envelope. As set forth above, it was testified to at trial that the purpose of the 'devil letter' was to divert attention from the true killer. Thus, even another's DNA on the letter would not be 'outcome determinative.'" (Emphasis in original.)

{¶ 20} As for Emerick's request for a list of biological materials, the court found that Emerick had previously been provided the list that he had requested under R.C. 2953.73. The court noted that Emerick's counsel had been given access to all evidence held in the court's property room, and trial counsel had been given access to a list of all available evidence through the open discovery provisions of the Court Management Plan. Citing *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, the court held that the State need not produce the list because DNA would not produce an outcome determinative result. The

court denied Emerick's request for a list of all biological evidence collected at the crime scene and from the victims.

{¶ 21} Emerick appeals from the trial court's judgment, raising three assignments of error.

II

{¶ 22} As recognized by the Supreme Court, "[s]ince 1998, DNA testing has advanced so far that 'a DNA profile may now be developed from items which were previously unsuccessfully typed or potentially not attempted due to the compromised or limited nature of the sample,' according to one of the expert witnesses. The PCR DNA testing used in this case in 1998 has been largely replaced by two newer technologies – short tandem repeat (or STR) testing and Y-chromosome STR (or Y-STR) testing." *State v. Prade*, 126 Ohio St. 3d 27, 31, 2010-Ohio-1842, ¶20.

{¶ 23} Prompted by advances in DNA testing, in 2003, the Ohio legislature enacted Sub.S.B. 11, which established "a mechanism and procedures for the DNA testing of certain inmates serving a prison term for a felony or under a sentence of death." See former R.C. 2953.71 to 2953.83. This statutory scheme was amended in 2004 and 2006, and again in 2010. The case before us requires us to interpret the post-conviction DNA testing statutes, as amended in 2006.

{¶ 24} The trial court "has discretion on a case-by-case basis" to accept or reject an eligible inmate's application for DNA testing. R.C. 2953.74(A). We therefore review the trial court's denial of Emerick's motion for further DNA testing for an abuse of discretion. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the

part of the trial court. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶130. Abuse of discretion usually involves decisions that are unreasonable rather than arbitrary or unconscionable. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 601. In this regard, unreasonable includes a discretionary decision that is unsupported by the evidence. See, e.g., *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶18, quoting Black's Law Dictionary (8th Ed.2004) 11.

## III

{¶ 25} As a threshold matter, the State asserts that Emerick's request for further DNA testing is barred by res judicata, because he could have sought testing of the additional items in his first application for DNA testing. The State notes that the Eighth District in *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, found that res judicata does not apply in the context of post-conviction DNA testing, but the State asserts that *Ayers* is distinguishable from the facts before us.

{¶ 26} "The doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as *** estoppel by judgment, and issue preclusion, also known as collateral estoppel." *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 381. "Under the doctrine of res judicata, '[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.'" *Kelm v. Kelm,* 92 Ohio St.3d 223, 227, 2001-Ohio-168, quoting *Grava,* supra, at syllabus. Furthermore, "[r]es judicata operates to bar litigation of 'all claims which were or might have been litigated in a first lawsuit.'" *Grava*, 73 Ohio St.3d at 382, quoting *Natl. Amusements, Inc. v. Springdale* (1990), 53 Ohio

St.3d 60, 62 (emphasis omitted).

{¶ 27} In *Ayers*, the defendant was convicted of aggravated murder, aggravated robbery, and aggravated burglary of a woman who lived in his apartment building. Prior to trial, investigators determined that a pubic hair found in the victim's mouth did not belong to Ayers and that no biological material was found under the victim's fingernails. Four years after his conviction, Ayers sought DNA testing of the pubic hair, blood, and skin from underneath the victim's fingernail. The trial court denied the application, stating that it had already been determined that the blood and pubic hair could not be linked to Ayers and that no biological material was found under the victim's fingernails. Ayers subsequently filed a second application for DNA testing, seeking the testing of the same evidence. Ayers noted the advances in DNA testing and emphasized that the statutory definition of "outcome determinative" had changed since his first application. The trial court denied the application as barred by res judicata and because the results would not be outcome determinative. Ayers appealed the trial court's decision, arguing, in part, that res judicata did not apply because the denial of his first application was based on a different, less lenient standard for "outcome determinative."

{¶ 28} The Eighth District reversed the trial court's ruling. It held that, "[b]ecause Ayers's first application was considered and rejected under the earlier, more restrictive statute, we find that principles of res judicata are inapplicable to preclude consideration of this petition." *Ayers* at ¶26. The Court emphasized that the "ultimate objective" of our system of criminal law is that "the guilty be convicted and the innocent go free." Id. at ¶24, quoting *Herring v. New York* (1975), 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593.

The Eighth District found that the Ohio legislature had "plainly embraced this notion" by lowering the outcome determinative standard. The appellate court thus concluded:

**{¶ 29}** "Nothing that we have said is meant to suggest that convicted defendants are entitled to additional DNA testing based on nothing more than the passage of time and the assumption that science has developed more refined testing methods. We have made it clear that the courts must consider such motions on a case-by-case basis and those motions must make a threshold showing that DNA testing could be outcome determinative. If that showing is made, res judicata will not bar testing even though an earlier application for DNA testing was denied. "

**{¶ 30}** We likewise reject the State's contention that res judicata applies. As stated in *Ayers*:

**{¶ 31}** "If DNA testing has the proven ability to 'exonerate[ ] wrongly convicted people,' we can perceive no viable argument that matters of judicial economy should supersede the law's never-ending quest to ensure that no innocent person be convicted. The refinement of DNA testing has shown that law and science are intersecting with increasing regularity. When scientific advances give the courts the tools to ensure that the innocent can go free, those advances in science will necessarily dictate changes in the law." Id. at ¶24 (citation omitted).

**{¶ 32}** Significantly, R.C. 2953.74 permits successive applications for DNA testing by addressing circumstances when DNA testing may be ordered, even though the same biological material has already been tested. In addition to changing the definition of "outcome determinative," the 2006 changes to the post-conviction DNA testing statute

increase the number of eligible applicants, facilitate the granting of applications for DNA testing, and allow unidentified DNA to be entered in the Combined DNA Index System (CODIS) for matching with known felons. These changes support a conclusion that this court should permit successive applications for DNA testing, even when the biological materials addressed in the successive application could have been raised in a prior application, provided that all the statutory criteria are met.

{¶ 33} Emerick's request for further DNA testing is not barred by res judicata.

IV

{¶ 34} Emerick's first assignment of error states:

{¶ 35} "The Trial Court Erred When It Found that Ohio Rev. Code 2953.74(B) Was A Bar to DNA Testing, in Direct Contradiction of This Court's Previous Ruling in *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334, *appeal denied*, 114 Ohio St.3d 1511, 2007-Ohio-4285."

{¶ 36} In his first assignment of error, Emerick asserts that the trial court erred in concluding that R.C. 2953.74(B) was a bar to additional post-conviction DNA testing, because DNA testing was generally available at the time of Emerick's trial. Emerick contends that the trial court's finding was contrary to our conclusions in *Emerick II*.

{¶ 37} The State agrees with Emerick that the trial court's denial of further testing based on the fact that DNA testing was generally accepted, admissible, and available at the time of Emerick's trial "goes against this Court's decision in Emerick's appeal of the trial court's denial of his first application for post-conviction DNA testing." Nevertheless, the State asserts that the trial court correctly concluded that additional DNA testing was

precluded under R.C. 2953.74(B)(1). It asserts that res judicata barred Emerick's successive application for DNA testing where Emerick was aware of the evidence and could have sought its testing in his prior application; we have already rejected, supra, the State's res judicata argument.

{¶ 38} R.C. 2953.74(B)(1), as it existed when Emerick's motion for further DNA testing was filed in 2009,[1] provided:

{¶ 39} "(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:

{¶ 40} "(1) The inmate did not have a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available."

{¶ 41} As stated above, the trial court held that no criterion was satisfied, finding that "DNA testing was generally available, accepted, and admissible" as demonstrated by the fact that some DNA testing was conducted in his case and entered into evidence at trial.

---

[1]The DNA testing statutes, including R.C. 2953.74, were revised in Sub.S.B. 77, effective July 6,

The court believed that Emerick was seeking "to reverse the apparent strategic decision he made at the time of his trial not to have DNA testing performed on the items now requested for testing."

{¶ 42} The trial court's decision on this issue is directly contrary to *Emerick II*. In that case, we stated:

{¶ 43} "Emerick contends that the available technology in DNA testing in 1996 was insufficient to reach the definitive results now possible using Y-Chromosome Short Tandem Repeat ('Y-STR') DNA Analysis. It is undisputed that Y-STR analysis was not available at the time of Emerick's trial. Moreover, it was partially the development of Y-STR technology that prompted the General Assembly to enact R.C. 2953.71 through 2953.83 in order to allow otherwise qualified inmates the opportunity to take advantage of advances in technology that were not available at the time of their trials. Emerick's case falls squarely under that category. While it is true that DNA testing was an accepted practice at the time of his trial, the technology has advanced to such a degree that Emerick is entitled to additional testing using the new technique. Because Y-STR DNA analysis was not available at the time of his prosecution, the biological materials Emerick seeks to be tested are eligible for analysis pursuant to R.C. 2953.74(B)(1)." *Emerick II* at ¶18.

{¶ 44} Although the items that Emerick seeks to test in this appeal differ from those addressed in *Emerick II*, our conclusions regarding the availability of DNA testing at the time of Emerick's trial have not changed.

{¶ 45} Emerick's first assignment of error is sustained.

---

2010. The 2010 version of R.C. 2953.74(B)(1) replaces "inmate" with "offender."

V

{¶ 46} Emerick's second assignment of error states:

{¶ 47} "The Trial Court Erred in Focusing on the Likelihood that DNA Testing Would Produce Outcome Determinative Results, Rather than Focusing on the Outcome Determinative Standard."

{¶ 48} In his second assignment of error, Emerick claims that the trial court misapplied the outcome determinative standard. He emphasizes that the outcome determinative standard had changed since the trial court's decision on his first application for DNA testing.

{¶ 49} In 2003, "outcome determinative" was defined in the post-conviction DNA testing statutes to mean: "[H]ad the results of DNA testing been presented at the trial of the subject inmate requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the inmate is an eligible inmate and is requesting the DNA testing * * *, *no reasonable factfinder would have found the inmate guilty of that offense* ***." (Emphasis added.) Former R.C. 2953.71(L). This definition applied when Emerick first sought post-conviction DNA testing and when we rendered *Emerick II.*

{¶ 50} With 2006 S.B. 262, effective July 11, 2006, the Ohio legislature modified the definition of "outcome determinative." When Emerick filed his second application for DNA testing, R.C. 2953.71 provided that "outcome determinative" means that "had the results of DNA testing *of the subject inmate* been presented at the trial of the subject inmate requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the inmate is an eligible inmate and is requesting the DNA testing or for

which the inmate is requesting the DNA testing under section 2953.82 of the Revised Code, *and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability* that no reasonable factfinder would have found the inmate guilty of that offense ***." (Emphasis added.) R.C. 2953.71(L).

{¶ 51} Under the 2006 changes, a defendant can now satisfy the "outcome determinative" test by showing that a "strong probability" exists that no reasonable factfinder would have found him guilty; he need no longer establish that "no reasonable factfinder would have found the inmate guilty of that offense," as required by the prior version of R.C. 2953.71(L). Thus, the 2006 changes establish "a lower standard for determining whether a reasonable fact-finder would have found guilt." *Ayers* at ¶34. The 2006 version of the statute also requires the DNA test results to be considered in the context of all the available, admissible evidence, thus making clear that "an exclusion result is not the only fact to consider when deciding whether DNA testing will be outcome determinative." Id.

{¶ 52} Emerick argues that we previously found that the outcome determinative test had been satisfied (under the more strict 2003 standard) when "an unidentified donor's DNA is located on different evidentiary items." *Emerick II* at ¶25. Emerick thus asserts that we must reach the same result under the current outcome determinative test. The State responds that, even if Emerick were excluded as the source of DNA on the items he seeks to test, the outcome of Emerick's trial would not have been different when viewed in light of

the totality of the evidence offered at trial. The State further responds that several items sought to be tested are not "biological material" as contemplated by R.C. 2953.74(C)(1).

**{¶ 53}** We find no meaningful distinction between the items tested in *Emerick II* and Emerick's current request to test various additional blood samples from the men's bathroom, paper towels found near one of the victims, paper towels found on the countertop and sink of the ladies' room, and the devil letter. The items addressed in *Emerick II* were directly related to the commission of the murders and robbery, and were not items generally found at the bar. (As detailed above, *Emerick II* concerned fingernail scrapings of the victims, swabs of blood on the bathroom walls, and genetic material on the murder weapons, which were gathered at the crime scene.) An unidentified person's DNA on any of these categories would have linked an unknown person to the crimes. Likewise, the presence of an unidentified donor's DNA in the newly-requested blood samples and/or paper towels taken from the scene *and* on the envelope of the devil letter, which was allegedly written by the perpetrator, would create a strong probability that no reasonable jury would have found him guilty.[2] See, also, *State v. Reynolds*, 186 Ohio App.3d 1, 2009-Ohio-5532, an aggravated robbery and felonious assault case, in which we held that the absence of the defendant's DNA and the simultaneous presence of a known felon's DNA from CODIS would create a strong probability of a different outcome. Id. at ¶21.

**{¶ 54}** In reaching this conclusion, we recognize the substantial amount of evidence

---

[2]We are cognizant that the robbery and murders occurred at a public drinking establishment where numerous people might have touched the paper towels, and that the mere presence of paper towels in the restrooms is not significant, absent some indication that they were related to the offenses. In this case, the evidence showed that the bar had been substantially cleaned and that the perpetrator had entered both bathrooms. We emphasize that unknown DNA on the paper towels would be significant only if the same unknown DNA were found on other evidence related to the crime.

offered by the State against Emerick. However, if DNA testing revealed that an unknown person's DNA were on the devil letter and at the crime scene, the State's theory of the case would be undermined. The State presented no evidence that the crimes at Sloopy's were committed by more than one person. To the contrary, the State argued at trial that the contents of the devil letter, which referred to several perpetrators, was "[t]rying to blame it [the crime] on other individuals." In addition, defense counsel vigorously cross-examined each of the State's witnesses and presented evidence on Emerick's behalf; the credibility of the State's evidence did not go unchallenged. In short, when considering all the available, admissible evidence, the absence of the defendant's DNA and the simultaneous presence of another's DNA on the devil letter and at the crime scene would create a strong probability of a different outcome.

{¶ 55} The State argues that Emerick is not entitled to testing of the devil letter or its envelope, because they were not collected from "the crime scene or the victim," as required by R.C. 2953.74(C)(1). It is undisputed that the devil letter was not collected from Sloopy's or from the victims. Indeed, the letter was sent to the media several days after the offenses were committed. Nevertheless, we view the sending of the letter as an extension of the crime by the perpetrator, as apparently did the State since it offered the envelope and letter as evidence regarding the crime at trial and presented the testimony of a handwriting expert to tie Emerick to that correspondence. We conclude that the letter and its envelope are appropriate for testing under the post-conviction DNA testing statutes.

{¶ 56} We likewise reject the State's assertion that the devil letter and other evidence do not fall under the post-conviction DNA testing statute because they are not

"biological material." Under R.C. 2953.71(A), an application for DNA testing means "a request through postconviction relief for the state to do DNA testing on biological material ***." Biological material is defined as "any product of a human body containing DNA." R.C. 2953.71(B).

{¶ 57} It is undisputable that biological materials are commonly located on other items, such as clothing, bedding, or carpet. Those other items are routinely collected by the police so that suspected biological materials on those items may be tested. And, as discussed by Cindy Duerr in her testimony at Emerick's trial, forensic scientists first determine whether the collected items do, in fact, contain biological materials. We see no reason why the devil letter and paper towels, which may contain biological materials, should be treated any differently than other items with possible biological materials that were collected by the police.

{¶ 58} We do not find *Emerick II* to be dispositive of the outcome determinative issue on other items now requested to be tested. In particular, Emerick seeks to test a beer bottle found near Knapke's body. The beer bottle was partially full and had Knapke's fingerprint on it; a toxicology test of Knapke's blood showed that he had drunk a small amount of alcohol. Emerick has offered no explanation how the beer bottle is related to the offense, other than speculation that the perpetrator may have touched it. The trial court did not err in denying Emerick's request to have DNA testing performed on the beer bottle.[3]

---

[3]At the July 9, 2010 hearing, counsel for Emerick informed the trial court that the Innocence Project would pay for any additional DNA testing that was permitted by the court. R.C. 2953.71 specifically states that an "application" under the postconviction DNA statute means a request "for *the state* to do DNA testing on biological material." A request to permit the defendant to conduct post-conviction DNA testing funded by a private source would not fall under R.C. 2953.71.

Such a request is permitted by R.C. 2953.84, which was enacted in Senate Bill 262. That statute

{¶ 59} Judge Learned Hand once famously observed that "[o]ur procedure has been always haunted by the ghost of the innocent man." *United States v. Garsson* (S.D.N.Y 1923), 291 F. 646, 649. But he then concluded that "[i]t is an unreal dream." Id. Unfortunately, more recent cases – particularly those involving DNA exoneration even with eyewitness testimony – have brought this ghost back to the justice system's consciousness. A jury found Emerick guilty, and we appreciate the frustration and even anguish that the apparent lack of finality engenders in law enforcement and, especially, the victims' families. However, we believe the legislature and the courts, while perhaps in most cases not able to be 100% certain of guilt or innocence, have established procedures to be followed regarding biological evidence to approach the "ultimate objective" that "the guilty be convicted and the innocent go free." *Herring*, supra.

{¶ 60} The second assignment of error is sustained in part and overruled in part.

VI

{¶ 61} Emerick's third assignment of error states:

{¶ 62} "The Trial Court erred in Ruling That the State is Not Required to Provide a Report on All Biological Materials in Defendant's Case, in Direct Opposition to the Clear

---

provides: "The provisions of sections 2953.71 to 2953.82 of the Revised Code by which an inmate may obtain postconviction DNA testing are not the exclusive means by which an inmate may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an inmate may obtain postconviction DNA testing."

Provided that a sufficient parent sample is available and the chain of custody is maintained, we see no reason why a trial court would decline a request for post-conviction DNA testing by the defendant when conducted at the defendant's own or another private entity's expense. We emphasize that any request for DNA testing outside of the provisions of R.C. 2953.71 to 2953.82 would not require the State to provide a list of all existing biological materials, as required by those sections.

Although the Innocence Project expressed its intent to pay for additional DNA testing, Emerick has consistently asserted that he is entitled to DNA testing under the statutory criteria, not R.C. 2953.84. The trial court did not err in focusing on the statutory requirements for additional DNA testing. See *State v. Constant*, Lake App. No. 2008-L-100, 2009-Ohio-3936.

Language of O.R.C. 2953.75."

{¶ 63} Under R.C. 2953.75, the trial court must require the prosecutor "to use reasonable diligence to determine whether biological material was collected from the crime scene or victim of the offense *** and whether the parent sample of that biological material still exists at that point in time." In making these determinations, the prosecuting attorney must "rely upon all relevant sources," including, among others, all prosecuting authorities in the case, all law enforcement authorities involved in the investigation, and all crime laboratories involved at the any time with the biological materials in question. R.C. 2953.75(A). Thereafter, the prosecutor must prepare a report with his or her determinations. R.C. 2953.75(B). A copy of the report must be filed with the court and provided to the defendant and the attorney general. Id.

{¶ 64} The trial court is not required to first order the prosecuting attorney to prepare and file the DNA-evidence report upon the filing of an application for DNA testing by an eligible inmate. *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246. Rather, the trial court may, in its discretion based upon the facts and circumstances presented in the case, first determine whether the eligible inmate has demonstrated that the DNA testing would be outcome-determinative. Id.

{¶ 65} In this case, we have concluded that DNA test results implicating a third party as the source of blood in the bathrooms, biological material on paper towels from the bathrooms and biological material on the devil letter and its envelope would be outcome-determinative. Accordingly, the trial court erred in failing to order the prosecutor to prepare a DNA-evidence report, as required by R.C. 2953.75.

**{¶ 66}** The third assignment of error is sustained.

## VII

**{¶ 67}** The trial court judgment will be affirmed in part, reversed in part, and remanded for further proceedings.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Andrew T. French
Mark Godsey
Hon. Barbara P. Gorman