[Cite as *State v. Ridley*, 2020-Ohio-2779.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 1-19-55

    v.

CARLOS RIDLEY,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 1981 0780

Judgment Affirmed

Date of Decision: May 4, 2020

APPEARANCES:

    *Donald R. Caster* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Appellant, Carlos Ridley ("Ridley"), appeals the August 14, 2019 judgment of the Allen County Court of Common Pleas rejecting his application for postconviction DNA testing. For the reasons that follow, we affirm.

{¶2} This matter originated with Ridley's 1981 convictions for the murders of two adults, Sarah Thirkill ("Sarah") and Pelham Thirkill ("Pelham"), the murder of a young girl, Latrina Jones ("Latrina"), and the attempted murder of a young boy, Melvin Jones ("Melvin"). On the evening of March 15, 1981, the severely beaten bodies of Sarah, Pelham, and Latrina were discovered inside a home in Lima, Ohio. Melvin, who had sustained a number of serious head wounds, was found clinging to life among the bodies. Over the following week, Ridley and another man, Lawrence Daniel ("Daniel"), were identified as suspects in the crimes and subsequently arrested.

{¶3} On March 26, 1981, Ridley and Daniel were jointly indicted on four counts: Counts One through Three of aggravated murder in violation of R.C. 2903.01(A) and Count Four of attempted murder in violation of R.C. 2903.02(A) and 2923.02(A). (Doc. No. 1). On March 27, 1981, Ridley appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. Nos. 1, 49).

**{¶4}** A joint jury trial commenced on August 10, 1981. (Doc. Nos. 155, 228). Throughout the trial, Ridley and Daniel maintained that they had no involvement whatsoever in the murders of Sarah, Pelham, and Latrina and in the attempted murder of Melvin. Nonetheless, on August 26, 1981, the jury found Ridley and Daniel guilty of three counts of murder, rather than aggravated murder as charged in Counts One through Three, and of one count of attempted murder as charged in Count Four. (Doc. No. 224); (Aug. 10-26, 1981 Tr. at 1764-1766). The trial court proceeded immediately to sentencing. (Doc. No. 228); (Aug. 10-26, 1981 Tr. at 1766). Ridley and Daniel were each sentenced to 15 years to life in prison on each of Counts One through Three and 7 to 25 years in prison on Count Four. (Doc. No. 228); (Aug. 10-26, 1981 Tr. at 1768). The trial court ordered that the sentences for Counts One through Four be served consecutively. (Doc. No. 228); (Aug. 10-26, 1981 Tr. at 1768). Thus, Ridley and Daniel were each sentenced to an aggregate term of 52 years to life in prison. This court upheld their convictions and sentences on appeal. *State v. Ridley*, 3d Dist. Allen No. 1-82-1, 1983 WL 7305 (July 22, 1983); *State v. Daniel*, 3d Dist. Allen No. 1-82-5, 1983 WL 7303 (July 22, 1983).

**{¶5}** On June 21, 2019, Ridley filed an application for postconviction DNA testing. (Doc. No. 259). In his application, Ridley requested that the following pieces of evidence be tested for DNA: three pill vials; a wrist watch; a piece of a rust-colored maroon velour shirt; two lead slugs; a fleece-lined right-hand glove; a

broken butcher's knife; a yellow extension cord; a piece of linoleum containing a bloody footprint; a galvanized pipe; a hammer handle; a broken hammer; the victims' clothing; a handgun; and five spent shells recovered from the handgun. (*Id.*). On July 31, 2019, the State filed a memorandum in opposition to Ridley's application for postconviction DNA testing. (Doc. No. 260). On August 14, 2019, the trial court rejected Ridley's application for postconviction DNA testing on the basis that a result of DNA testing excluding Ridley as a source of any biological material found on the aforementioned pieces of evidence would not have been "outcome determinative" in his 1981 trial. (Doc. No. 261).

{¶6} Ridley filed his notice of appeal on September 13, 2019. (Doc. No. 263). He raises one assignment of error for our review.

### Assignment of Error

**The trial court erred in denying Appellant's application for postconviction DNA testing.**

{¶7} In his assignment of error, Ridley argues that the trial court erred by rejecting his application for postconviction DNA testing. Specifically, Ridley argues that the trial court erred by determining that DNA testing would not have been "outcome determinative" because "the absence of [his] DNA on the items [he wishes to test] * * *, coupled with the presence of another person's DNA, would conclusively prove" that he did not commit the crimes for which he was convicted. (Appellant's Brief at 8). Ridley further contends that the trial court applied an

-4-

incorrect legal standard to determine whether DNA testing would have been "outcome determinative." (*Id.* at 8, 10). Finally, Ridley suggests that the trial court erred by failing to order the State to prepare an inventory of the items available for DNA testing. (*Id.* at 10).

{¶8} "R.C. 2953.71 through 2953.84 governs postconviction DNA testing." *State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842, ¶ 9. Under R.C. 2953.73, an "eligible offender"[1] who wishes to request postconviction DNA testing "shall submit an application for DNA testing on a form prescribed by the attorney general for this purpose and shall submit the form to the court of common pleas that sentenced the offender for the offense for which the offender is an eligible offender and is requesting DNA testing." R.C. 2953.73(A). *See* R.C. 2953.72(A). "If an eligible offender submits an application for DNA testing under [R.C. 2953.73(A)], the court shall make the determination as to whether the application should be accepted or rejected * * * in accordance with the criteria and procedures set forth in [R.C. 2953.74 to 2953.81] * * *." R.C. 2953.73(D). R.C. 2953.74 sets forth a set of criteria "by which eligible offender applications for DNA testing will be screened," and upon receipt of a qualifying application for postconviction DNA

---

[1] As relevant to this case, an offender is an "eligible offender" if "[t]he offense for which the offender claims to be an eligible offender is a felony, * * * the offender was convicted by a judge or jury of that offense[,]" "[t]he offender was sentenced to a prison term * * * for the felony described in [R.C. 2953.72(C)(1)(a)], and the offender is in prison serving that prison term * * *." R.C. 2953.72(C)(1)(a), (b)(i). *See* R.C. 2953.71(F).

testing, the court "will apply those criteria to determine whether to accept or reject the application * * *." R.C. 2953.72(A)(4).

{¶9} Under R.C. 2953.74, if an eligible offender submits an application for postconviction DNA testing under R.C. 2953.73, the court may accept the application if:

> The offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in [R.C. 2953.74(D)] would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.

R.C. 2953.74(B)(1). In addition, the court may accept an eligible offender's application for postconviction DNA testing only if all of the following apply:

(1)   The court determines pursuant to [R.C. 2953.75] that biological material was collected from the crime scene or the victim of the offense for which the offender is an eligible offender and is requesting the DNA testing and that the parent sample of that biological material against which a sample from the offender can be compared still exists at that point in time.

(2)   The testing authority determines all of the following pursuant to [R.C. 2953.76] regarding the parent sample of the biological material described in [R.C. 2953.74(C)(1)]:

(a)   The parent sample of the biological material so collected contains scientifically sufficient material to extract a test sample.

(b)   The parent sample of the biological material so collected is not so minute or fragile as to risk destruction of the parent sample by the extraction described in [R.C. 2953.74(C)(2)(a)]; provided that the court may determine in its discretion, on a case-by-case basis, that, even if the parent sample of the biological material so collected is so minute or fragile as to risk destruction of the parent sample by the extraction, the application should not be rejected solely on the basis of that risk.

(c) The parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing, and the parent sample otherwise has been preserved, and remains, in a condition that is scientifically suitable for testing.

(3) The court determines that, at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing, the identity of the person who committed the offense was an issue.

(4) The court determines that one or more of the defense theories asserted by the offender at the trial stage in the case described in [R.C. 2953.74(C)(3)] or in a retrial of that case in a court of this state was of such a nature that, if DNA testing is conducted and an exclusion result is obtained, the exclusion result will be outcome determinative.

(5) The court determines that, if DNA testing is conducted and an exclusion result is obtained, the results of the testing will be outcome determinative regarding that offender.

(6) The court determines pursuant to [R.C. 2953.76] from the chain of custody of the parent sample of the biological material to be tested and of any test sample extracted from the parent sample, and from the

totality of circumstances involved, that the parent sample and the extracted test sample are the same sample as collected and that there is no reason to believe that they have been out of state custody or have been tampered with or contaminated since they were collected.

R.C. 2953.74(C)(1)-(6).

{¶10} In determining whether R.C. 2953.74(B)(1)'s "outcome determinative" criterion has been satisfied, the court "shall consider all available admissible evidence related to the subject offender's case." R.C. 2953.74(D). As used in R.C. 2953.74,

"Outcome determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in [R.C. 2953.74(D)], there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense * * *.

R.C. 2953.71(L). Furthermore, as used in R.C. 2953.74, "exclusion" or "exclusion result" means "a result of DNA testing that scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question, in relation to the offense for which the offender is an eligible offender and for which the * * * prison term was imposed upon the offender." R.C. 2953.71(G).

{¶11} Finally, R.C. 2953.75 provides:

If an eligible offender submits an application for DNA testing under [R.C. 2953.73], the court shall require the prosecuting attorney to use reasonable diligence to determine whether biological material was collected from the crime scene or victim of the offense for which the offender is an eligible offender and is requesting the DNA testing against which a sample from the offender can be compared and whether the parent sample of that biological material still exists at that point in time.

R.C. 2953.75(A). "The prosecuting attorney shall prepare a report that contains the prosecuting attorney's determinations made under [R.C. 2953.75(A)] and shall file a copy of the report with the court and provide a copy to the eligible offender and the attorney general." R.C. 2953.75(B).

**{¶12}** Before addressing the merits of Ridley's assignment of error, we must first determine our standard of review. Ridley notes that "[t]his Court has not previously reviewed the denial of an application for postconviction DNA testing, and thus has not adopted a standard of review in such cases." (Appellant's Brief at 7). Indeed, we have been unable to locate a published decision of this court in which we reviewed the acceptance or rejection of an application for postconviction DNA testing. Ridley urges this court to adopt the standard of review that we apply when considering rulings on motions to suppress evidence. (*Id.*). Under Ridley's suggested standard of review, review of a trial court's acceptance or rejection of an application for postconviction DNA testing presents a mixed question of law and fact, which requires this court to defer to the trial court's findings of fact if they are supported by competent, credible evidence but which obligates this court to consider de novo "whether those facts satisfy the statutory standard for testing * * *." (*Id.* at 7-8). In contrast, the State argues that the proper standard of review is "whether or not the trial court abused its discretion in denying the application." (Appellee's Brief at 4).

**{¶13}** After examining the relevant statutory authority and case law, we find merit in the State's argument that an abuse-of-discretion standard of review is the appropriate standard of review. First, the postconviction DNA testing statutes themselves suggest that a trial court's decision concerning an application for

postconviction DNA testing should be reviewed for an abuse of discretion. For example, R.C. 2953.72(A)(8) provides that "the court of common pleas has the sole discretion subject to an appeal * * * to determine * * * whether an eligible offender's application for DNA testing satisfies the acceptance criteria described in [R.C. 2953.72(A)(4)] and whether the application should be accepted or rejected * * *." *See* R.C. 2953.74(A). Moreover, abuse-of-discretion review is supported by precedent of the Supreme Court of Ohio. *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, ¶ 37 (referring to the trial court's discretion throughout the opinion and concluding that "the trial court did not abuse its discretion in denying the application"). Lastly, many Ohio courts of appeals utilize an abuse-of-discretion standard of review when reviewing a trial court's decision on an application for postconviction DNA testing. *E.g.*, *State v. Rawls*, 8th Dist. Cuyahoga No. 104191, 2016-Ohio-7962, ¶ 13; *State v. Bunch*, 7th Dist. Mahoning No. 14 MA 168, 2015-Ohio-4151, ¶ 63; *State v. Galloway*, 10th Dist. Franklin No. 07AP-611, 2008-Ohio-3470, ¶ 13. In fact, in a fairly recent decision, the Second District Court of Appeals explicitly rejected a mixed standard of review similar to the one advocated by Ridley in favor of an abuse-of-discretion standard. *State v. Sells*, 2d Dist. Miami No. 2016-CA-15, 2017-Ohio-987, ¶ 5, fn. 2. Therefore, we hold that when reviewing a trial court's decision to accept or reject an eligible offender's application for postconviction DNA testing, we determine whether the trial court abused its

discretion by accepting or rejecting the application. An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶14} Having established the proper standard of review, we turn now to Ridley's arguments, beginning with his claim that the trial court applied the wrong legal standard when determining whether the DNA testing he requested would have been outcome determinative. In its judgment rejecting Ridley's application, the trial court concluded, in part, that even with an exclusion result, "[t]he totality of evidence presented at the trial would not prevent a reasonable factfinder from reaching a guilty verdict." (Doc. No. 261). Ridley maintains that "th[is] standard utilized by the trial court—whether the jury's verdict at trial was supported by sufficient evidence—is not the standard codified by the General Assembly." (Appellant's Brief at 8). However, Ridley's argument overlooks the last sentence of the trial court's outcome-determinative analysis, in which the trial court concluded that there is "no strong probability that no reasonable factfinder would have found [Ridley] guilty in the context of and upon consideration of all the evidence related to [Ridley's] case as described in R.C. 2953.74(D)." (Doc. No. 261). This language is substantially similar to the outcome-determinative standard laid out in R.C. 2953.71(L) and parallels language in R.C. 2953.74(B)(1). As a

result, we cannot conclude that the trial court applied an incorrect standard when it determined that an exclusion result would not have been outcome determinative.

{¶15} Next, we consider Ridley's contention that "the trial court [should have] * * * require[d] the State to comply with its obligations under R.C. 2953.75 to prepare an inventory of the items available for testing." (Appellant's Brief at 10). He argues that "the inventory is essential in analyzing the probative impact of testing multiple items of evidence" and that, "because the trial court failed to order the State to prepare an inventory, its analysis was necessarily incomplete." (*Id.*).

{¶16} Contrary to Ridley's assertion, we do not believe that the trial court erred by failing to order the State to assemble an inventory pursuant to R.C. 2953.75. When an eligible offender files an application for postconviction DNA testing,

> a trial court should exercise its discretion based upon the facts and
> circumstances presented in the case as to whether it will first
> determine whether the eligible [offender] has demonstrated that the
> DNA testing would be outcome-determinative or whether it should
> order the prosecuting attorney to prepare and file a DNA evidence
> report pursuant to R.C. 2953.75.

*Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, at ¶ 36. If a trial court determines that DNA testing would not have been outcome determinative, it may then reject the application without ordering the preparation of an inventory. *Id.* at ¶ 31-37.

Thus, the trial court in this case had broad discretion to evaluate, without the aid of an inventory, whether DNA testing would have been outcome determinative.

{¶17} Finally, we address the core of Ridley's assignment of error—his argument that the trial court erred by determining that an exclusion result would not have been outcome determinative. As indicated above, determining whether an exclusion result would have been outcome determinative requires courts to analyze the exclusion result "in the context of and upon consideration of all available admissible evidence related to the offender's case." R.C. 2953.71(L). Therefore, it is necessary to explore fully the details of the crimes for which Ridley was convicted and the manner in which the evidence he seeks to have tested factored into the State's case.

{¶18} At approximately 8:20 p.m. on March 15, 1981, Luther Woodfork ("Woodfork") and Ronald Coleman ("Coleman") arrived at 128 East Grand Avenue ("128 East Grand") in Lima, Ohio, Sarah and Pelham's home, to buy Preludin[2] from Sarah. (Aug. 10-26, 1981 Tr. at 712). Coleman went inside 128 East Grand while Woodfork waited outside in his car. (*Id.* at 709). Shortly thereafter, Coleman emerged from the residence, returned to the car, and told Woodfork, "I think that everyone in there is dead." (*Id.* at 709-710). Woodfork then entered 128 East Grand

---

[2] Preludin was a brand name of the drug phenmetrazine, a stimulant that was previously prescribed as an appetite suppressant. *State v. Beverly*, 4th Dist. Ross No. 1055, 1984 WL 5686, *2 (Dec. 11, 1984). Phenmetrazine is currently listed as a Schedule II stimulant in Ohio. R.C. 3719.41; Ohio Adm.Code 4729:9-1-02(C)(4).

where he found Sarah, Pelham, Latrina, and Melvin. (*Id.* at 710). According to Woodfork, "just about every article of clothing and furniture was blood smeared * * *." (*Id.*). Woodfork noticed a "slight flickering" of Melvin's finger and looked for the telephone so that he could call for an ambulance. (*Id.* at 711). However, finding that the telephone was off the hook and covered in blood, Woodfork left 128 East Grand, went next door, and called police from a neighbor's telephone. (*Id.*).

{¶19} Law enforcement officers and emergency medical technicians responded to 128 East Grand at approximately 8:30 p.m. (*Id.* at 774). Melvin was treated at the scene before he was rushed to the hospital, where he underwent emergency surgery to repair extensive damage to his skull. (*Id.* at 774, 1051-1055). After Melvin was taken to the hospital, law enforcement officers began their assessment of the crime scene. Pelham was found lying on the floor with several severe injuries to his forehead and to the top of his head. (*Id.* at 734, 784). In addition, a yellow extension cord was wrapped around his neck. (*Id.* at 750, 778). As for Sarah, one law enforcement officer remarked that it appeared "that the whole top of her head had been beaten in" and that she appeared to have sustained a puncture wound to her left breast. (*Id.* at 784). Latrina was also found to have suffered grievous head injuries. (*Id.* at 690).

{¶20} The Allen County Coroner arrived at 128 East Grand at approximately 10:00 p.m. (*Id.* at 689, 779). Upon examining Sarah, Pelham, and Latrina, he found

that their bodies had cooled down considerably and that rigor mortis had fully set in. (*Id.* at 690-691). Based on these findings, the coroner concluded that all three had died approximately 10-14 hours before his examination. (*Id.* at 693-694). Although the coroner acknowledged that he did not collect other data used to establish time of death, such as the contents of Sarah's, Pelham's, and Latrina's stomachs, the ambient temperature of the room in which their bodies were found, or reports of when they were last seen alive, the methods he used to determine their times of death were those that he regularly and routinely used to determine time of death in other homicides. (*Id.* at 702-705).

{¶21} Law enforcement officers recovered a number of items from the crime scene, including potential murder weapons. A piece of galvanized pipe approximately 16 inches long was found on a couch in the living room, and a 6-inch segment of galvanized pipe was discovered beneath Sarah's body. (Aug. 10-26, 1981 Tr. at 747, 751, 782). Following an analysis by the Bureau of Criminal Investigation ("BCI"), it was discovered that the pipe segments had matching individual break configurations, which indicated that the pipe segments were once joined together. (*Id.* at 1259-1260). BCI analysis also revealed the presence of human blood on both pipe segments. (*Id.* at 1260). In addition, the blade and handle of a butcher's knife were located 2-3 feet from the bodies of Sarah and Pelham. (*Id.* at 753, 781-782). Officers also found the head of a hammer wrapped in a washcloth

and tied with black wire. (*Id.* at 792-793). A hammer handle was located nearby. (*Id.* at 772, 792). Like the pipe segments, BCI analysis showed that the blade and handle of the butcher's knife were once joined and that the hammerhead and hammer handle were once part of the same hammer. (*Id.* at 1252, 1349-1350). The washcloth wrapped around the hammerhead and the broken butcher's knife both tested positive for the presence of human blood. (*Id.* at 1254-1256, 1261). Blood was found on the hammerhead and hammer handle but it could not be determined whether the blood was human in origin. (*Id.* at 1257).

{¶22} Bloody footprints were found in the kitchen. Most of the footprints were smeared or only partial imprints. (*Id.* at 889). As a result, only one section of the kitchen linoleum, containing the most complete footprint, was cut from the floor and collected as evidence. (*Id.* at 882, 889). However, photographs of partial footprints were taken and submitted to BCI for review. (*Id.* at 1399). From the photographs, BCI determined that the tread design of the partial footprints matched a tread design commonly found on Converse All Star gym shoes, but BCI was unable to determine the size of the shoe that made the impressions. (*Id.* at 1402, 1412). A BCI analyst testified that Converse All Star shoes "use[d] a star as an insignia which c[ould] appear in several [locations] on the shoe," including on "a piece of rubber glued along the back of the heel." (*Id.* at 1403-1404). One witness

testified that she knew Ridley to wear a pair of dirty white tennis shoes, and she believed that "there was a star" on the side of his shoes. (*Id.* at 1014).

{¶23} Other miscellaneous items that the perpetrators might have touched were collected from the scene, including three prescription pill bottles, a broken wristwatch, and a piece of maroon-colored velour fabric that was once part of the shirt Pelham was wearing when he was killed. (*Id.* at 756, 782, 1258). In addition, two .38 caliber bullets were recovered from the home. (*Id.* at 752, 760, 780-781, 1385-1386). One of the bullets was located in a pool of blood in the living room while the other bullet was found in the foyer beyond a doorway that appeared to have been struck by a bullet. (*Id.* at 752, 780-781). A brown suede fleece-lined right-hand glove was observed on the floor inside 128 East Grand on March 15. (*Id.* at 752-753, 870-871). However, law enforcement officers did not collect the glove until after 5:00 p.m. the following day. (*Id.* at 853, 895-896, 1357-1359). At the time the glove was collected, one of Daniel's acquaintances was present with law enforcement officers. (*Id.* at 906-908). When he saw the glove, he informed law enforcement officers that he believed that the glove belonged to Daniel. (*Id.* at 908). Subsequent BCI analysis did not detect the presence of blood on the glove. (*Id.* at 1270). No useable fingerprints were taken from inside 128 East Grand. (*Id.* at 734).

{¶24} On the morning of March 16, 1981, Dr. Shoba Pai ("Dr. Pai") performed autopsies on the bodies of Sarah, Pelham, and Latrina. (Aug. 10-26,

1981 Tr. at 666). Dr. Pai's external examination of Sarah's body revealed three large lacerations on the front of Sarah's head, a laceration on the left side of Sarah's face between the nose and cheek, three lacerations on Sarah's left breast, and a perforating wound behind Sarah's left ear that Dr. Pai believed to be a gunshot wound. (*Id.* at 668-670). Her internal examination revealed that Sarah had suffered a fracture of the left fifth rib, a laceration of the left temporal lobe of her brain, fractures of the skull bones, and hemorrhaging. (*Id.* at 671-673). In addition, bullet fragments were discovered in Sarah's skull, which corresponded to the perforating wound behind Sarah's left ear. (*Id.* at 672). Dr. Pai removed the bullet fragments and gave them to law enforcement officers. (*Id.* at 674). Dr. Pai determined that Sarah had died from a gunshot wound to the head, a penetrating wound of the left chest, and numerous contusions and lacerations of the skull and brain. (*Id.* at 673-674). Dr. Pai remarked that Sarah had sustained "a considerable amount of mutilation," and she opined that of the three bodies she examined, Sarah's body was the most severely mutilated. (*Id.* at 674).

{¶25} Dr. Pai's external examination of Latrina's body documented two large lacerations at the top of Latrina's head as well as pieces of brain tissue and indications that Latrina's skull had been fractured. (*Id.* at 675). The internal examination revealed a separation of the sutures that joined Latrina's skull bones, fractures of the skull bones, and contusions and lacerations of the brain with loss of

brain tissue. (*Id.* at 676). Dr. Pai did not recover any bullets from Latrina's body. (*Id.* at 677). Dr. Pai determined that Latrina had died from lacerations of the skull, multiple fractures of the skull bones, diffused hemorrhaging, and contusions and lacerations of the frontal and temporal lobes of the brain. (*Id.*).

{¶26} An external examination of Pelham's body revealed that he had suffered three lacerations to the front and top of his head, lacerations on his nose and below his right nostril, a perforating wound to the angle of the mouth on the left side of his face, and two wounds near his right ear that Dr. Pai initially believed to be gunshot wounds. (*Id.* at 677-678). Dr. Pai found a bullet lodged in Pelham's jaw that corresponded to the perforating wound in the angle of his mouth. (*Id.* at 678). The bullet was removed and submitted to law enforcement officers. (*Id.* at 682-683). No additional bullet fragments were recovered from Pelham's body. (*Id.* at 681). Dr. Pai also discovered that Pelham's mandible had been fractured and that he had lacerations at the base of his tongue. (*Id.* at 679). Dr. Pai determined that Pelham had died from a gunshot wound to the neck with a fracture of the mandible, diffused subarachnoid hemorrhaging, subdural hematoma, contusions and lacerations of the cerebrum and cerebellum, and lacerations of the skull. (*Id.* at 681-682). According to Dr. Pai, there was "some mutilation" of Pelham's body. (*Id.* at 682).

{¶27} Because he was under ten years of age, Melvin, the only surviving witness to the attack that took place inside 128 East Grand, was deemed incompetent to testify.[3] (Aug. 10-26, 1981 Tr. at 1049-1050). As a result, the State's case against Ridley and Daniel revolved around establishing Ridley and Daniel's activities and movements on March 15 and on the days that followed. At the time of crimes, Daniel was residing with Alma Brown ("Alma") and her son, James Brown ("James"), at 685 North Union Street ("685 North Union"), a residence located only a short walk from 128 East Grand. (*Id.* at 997, 1059-1060). Although Ridley maintained a separate residence with his girlfriend, Ridley stayed overnight with Daniel at 685 North Union on March 13 and 14, 1981. (*Id.* at 997, 1060, 1522, 1525). On the morning of March 15, Alma awoke and prepared to go to church. When she was ready to leave, she woke Daniel up and greeted him. (*Id.* at 1004). Alma stated that she saw both Daniel and Ridley at approximately 10:55 a.m. (*Id.* at 1005-1006). Alma left for church sometime between 11:00 a.m. and 11:15 a.m. (*Id.* at 1005-1006, 1070). After Alma left for church, only Ridley, Daniel, and James remained inside 685 North Union. (*Id.* at 1070).

{¶28} According to James, after Alma left for church, Ridley and Daniel stayed inside 685 North Union until approximately 11:35 a.m. (*Id.*). James testified

---

[3] "All persons are competent witnesses except * * * children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." R.C. 2317.01. The version of R.C. 2317.01 in effect at the time of Ridley's trial employed identical language. *See State v. Lewis*, 4 Ohio App.3d 275, 276 (3d Dist.1982).

that at 11:35 a.m., Ridley and Daniel got up and left the house through the kitchen door. (*Id.*). Ridley was dressed in "green khaki" pants and sneakers, and Daniel was wearing brown dress slacks and a brown shirt. (*Id.*). As Ridley and Daniel left 685 North Union, James asked Ridley where they were going, to which Ridley responded, "Never mind. You ask too many questions." (*Id.* at 1072). Daniel also requested that James leave the back door unlocked. (*Id.*). Ridley and Daniel were gone from approximately 11:35 a.m. until approximately 12:05 p.m., at which time they reentered 685 North Union through the back door. (*Id.* at 1070). James did not talk to Ridley or Daniel when they returned at 12:05 p.m. (*Id.* at 1072-1073).

{¶29} James stated that when Ridley and Daniel returned to 685 North Union, they immediately went upstairs and changed clothes. (*Id.* at 1073-1074). After ten minutes, Ridley and Daniel came back downstairs carrying brown paper grocery sacks containing clothes. (*Id.* at 1074). James testified that as Ridley and Daniel "were rushing to get out of the house," Ridley's bag "busted" and its contents spilled out. (*Id.* at 1073-1074). Specifically, James observed a pair of sneakers fall from Ridley's bag. (*Id.* at 1074). According to James, Ridley's "sneakers w[ere] a dirty white when he left and when they fell out they were stained with what looked like blood, they were red all over." (*Id.* at 1074-1075). Ridley quickly found another bag to hold his clothing. (*Id.* at 1075). Ridley and Daniel then exited the house, got into a cab, and left. (*Id.*).

{¶30} Throughout the remainder of March 15, James received a number of telephone calls from Ridley. James stated that the first of these calls occurred about an hour after Ridley and Daniel left in the cab. (Aug. 10-26, 1981 Tr. at 1076). During this phone call, Ridley requested that James walk to the corner of East Grand Avenue and North Union Street. (*Id.*). When James asked Ridley what was supposed to be happening at that corner, Ridley said, "Never mind, just don't talk to no one. Just go down and see what the corner is like and then come back and call." (*Id.* at 1076-1077). Following Ridley's request, James walked to the home of his aunt, Ada Cole ("Ada"), who was Sarah and Pelham's next-door neighbor, where he spoke with Ada about the phone call he received and asked for Sarah's telephone number. (*Id.* at 1077-1078). After about 20 minutes, James left Ada's home and returned to 685 North Union. (*Id.* at 1078). Back at 685 North Union, James received another telephone call from Ridley at approximately 2:00 p.m. (*Id.*). James testified that during this phone call, Ridley scolded him for talking to Ada, but still inquired about the state of the corner. (*Id.* at 1079). James received one final phone call from Ridley between 11:00 p.m. and 12:00 a.m. that evening. (*Id.* at 1082). Ridley again asked about the corner of East Grand Avenue and North Union Street. (*Id.*). By this time, the crime scene had been discovered, so James told Ridley that the corner was "lit up like a Christmas tree." (*Id.*).

{¶31} Meanwhile, after leaving 685 North Union in the cab, Ridley and Daniel spent the rest of the day traveling around the Lima area. Robert Alberter ("Alberter"), a cab driver, testified that he was dispatched to 685 North Union on March 15 at about 12:20 p.m. and that he picked up two black males at that address approximately six to seven minutes later. (*Id.* at 1123-1124). Though Alberter did not definitively identify Ridley and Daniel as the men he picked up at 685 North Union, he recalled that both men were carrying bags when they got in his cab. (*Id.* at 1124). Alberter dropped off his passengers at the corner of Catalpa Avenue and St. Johns Avenue, which was near the home of one of Ridley's acquaintances, Katherine Wright ("Wright"), and he remembered that the men paid their fare using a large wad of money. (*Id.* at 1125).

{¶32} Wright testified that Ridley and Daniel came to her house at approximately 12:30 p.m. to 12:45 p.m. on March 15 and asked for a ride to Ridley's house on Spring Street. (*Id.* at 1134, 1157-1159). Wright recalled that Ridley was in possession of a bag when she dropped off Ridley and Daniel on Spring Street. (*Id.* at 1159-1160). After spending time on Spring Street and elsewhere, Ridley and Daniel made their way to the home of Tina Flint at approximately 8:00 p.m., where Janet Peterson ("Peterson"), Ridley's girlfriend's niece, overheard a statement Ridley made to others in the home. (*Id.* at 1236-1238). According to Peterson, Ridley told someone in the home, "If anyone asks about him, we haven't seen him

all day." (*Id.* at 1239-1240). Following their visit to Tina Flint's house, Ridley and Daniel made their way back to Wright's house sometime after 8:00 p.m. (*Id.* at 1134). At first, Ridley came into Wright's house by himself. (*Id.* at 1162). Before Daniel arrived, Ridley took Wright aside and asked Wright whether she would do him a favor. (*Id.* at 1146-1147). Wright testified that she agreed and that Ridley then said, "Well, if anybody asks, tell them I been here all day." (*Id.* at 1146-1147). Daniel joined Ridley and Wright sometime after that, and Ridley and Daniel remained at Wright's house late into the evening watching television and socializing. (*Id.* at 1148-1149).

{¶33} The next day, March 16, 1981, Wright hosted a party at her home. (Aug. 10-26, 1981 Tr. at 1149-1150, 1242-1243). At approximately 6:00 p.m. or 7:00 p.m., a group of people, including Wright, Peterson, and Wright's half-brother, Melvin Flint ("Flint"), drove in Wright's car to pick up Ridley and Daniel and bring them to the party. (*Id.* at 1154, 1164-1166, 1192-1193, 1242-1243). After picking up Ridley and Daniel, the group returned to Wright's residence, at which point Wright and Peterson got out of the car and Ridley, Daniel, and Flint drove off. (*Id.* at 1166-1167, 1192-1193). After driving around searching for drugs, Ridley, Daniel, and Flint arrived at 685 North Union at approximately 10:00 p.m. (*Id.* at 1084, 1193-1197). Ridley, Daniel, and Flint met James inside of 685 North Union, and all four went upstairs to Daniel's bedroom. (*Id.* at 1197-1198). Daniel gathered

some of his clothing and, according to Flint and James, Daniel asked James to go downstairs to get a bag in which to put the clothing. (*Id.* at 1105, 1197-1198).

{¶34} Flint stated that once James went downstairs, it "appeared that [Daniel] bent over and pulled out * * * a towel or a rag and handed it to [Ridley]." (*Id.* at 1198). Flint testified that the towel appeared to contain a pistol and that the pistol was handed to him in the bedroom before James returned upstairs with the bag. (*Id.* at 1198-1199). Flint stated that he secured the pistol in his waistband and then returned to Wright's car, where he waited for roughly 20 minutes before Ridley, Daniel, and James exited 685 North Union and got into the car. (*Id.* at 1199). Ridley, Daniel, Flint, and James then drove back to Wright's house. (*Id.* at 1200). Flint stated that the pistol was not discussed during the ride. (*Id.*).

{¶35} Flint testified that once they arrived back at Wright's house, he "took the pistol and called [Daniel and Ridley] to come to the bedroom and tried to give it to them and they told [him] to put it up * * *." (*Id.* at 1200). Flint took the pistol and placed it in the pocket of his work coat, which was hanging in the bathroom closet. (*Id.*). Later in the evening, Flint went to the bathroom and found that the pistol was missing from his coat pocket. (*Id.* at 1202-1203). Flint testified that he told Ridley that the pistol was missing and that Ridley responded, "We have it." (*Id.* at 1203). Both James and Wright testified that they saw Ridley and Daniel

talking to each other in the bathroom at some point during the party. (*Id.* at 1085, 1151, 1169).

{¶36} Flint testified that he did not see the pistol again at Wright's party. (Aug. 10-26, 1981 Tr. at 1205). However, he stated that, shortly before leaving the party, he saw Ridley in possession of a package wrapped in plastic. (*Id.* at 1206). Flint believed that the plastic wrapped around the package "was a pillow plastic that [Wright] had bought some pillows that week * * *." (*Id.*). Flint also recalled that there was "a cloth or something" around the plastic. (*Id.* at 1207). Wright testified that she had recently purchased a pillow from a department store and placed it in her closet with some other items. (*Id.* at 1151). When she later looked in the closet, she found that the plastic bag in which the pillow was contained was missing and that only the foam bed pillow remained. (*Id.* at 1151-1152). She also stated that a piece of shredded towel was missing from the closet. (*Id.* at 1152).

{¶37} According to Flint, he asked Ridley whether he wanted to put the plastic package in a brown paper bag. (*Id.* at 1206-1207). Flint handed a small paper bag to Ridley, who placed the plastic-wrapped package inside the bag. (*Id.* at 1207). Flint, Ridley, Daniel, and James then left Wright's party sometime after 1:00 a.m. on March 17, 1981. (*Id.* at 1084-1085, 1207).

{¶38} The foursome left the party in Wright's car. (*Id.* at 1204). Flint was driving, Daniel was in the passenger seat, Ridley was in the left rear seat, and James

was in the right rear seat. (*Id.* at 1085-1086, 1204). James testified that Ridley had a brown paper bag that he placed on the back seat in between them. (*Id.* at 1086). Before dropping off Ridley, Daniel, and James, Flint stopped the car at a park so that he could urinate. (*Id.* at 1209). Flint testified that it was his idea to stop at the park and that neither Ridley nor Daniel asked him to stop. (*Id.* at 1221). Flint stated that, to the best of his recollection, he was the only person who got out of the car at the park. (*Id.* at 1209, 1221). However, James testified that Ridley also got out of the car and that he walked toward the edge of a pond located within the park. (*Id.* at 1086). James stated that Ridley pulled out a "cellophane bag" that "had the shape of a gun" as he exited the car, and he testified that while Flint relieved himself, Ridley threw the package into the pond. (*Id.* at 1086-1087). James stated that Ridley and Flint then got back into the car, and Flint began driving them home. (*Id.* at 1088, 1210).

{¶39} In the days following the party at Wright's house, investigators interviewed James and Flint. (Aug. 10-26, 1981 Tr. at 942, 943-944). James and Flint each directed law enforcement officers to a park at the southwest edge of Lima, Hover Park, and a pond located within the park ("Hover Pond"). (*Id.* at 943-944). On the afternoon of March 19, 1981, divers searched Hover Pond for the package that Ridley had allegedly thrown in the water. (*Id.* at 945, 1179-1180, 1185-1186). After searching for 10 to 15 minutes, divers located a plastic-wrapped package

roughly 50 feet from the shoreline. (*Id.* at 1181). The package appeared to be made up of three layers—a clear piece of plastic, featuring red and black lettering that appeared to be an advertisement for a pillow, wrapped around a brown paper bag, which was itself wrapped around a blue and white checkered cloth that covered a pistol. (*Id.* at 946, 950, 1181-1182, 1187-1188). At trial, Wright identified the plastic and the checkered cloth as the plastic pillow casing and towel shreds that had gone missing from her closet. (*Id.* at 1152-1153). In order to prevent corrosion and preserve the functionality of the pistol, the entire package was immersed in oil and transported to BCI for analysis. (*Id.* at 946-947, 1368).

{¶40} At BCI, the pistol was removed from its packaging and examined. Because the package had been fully submerged in oil, BCI analysts were unable to lift fingerprints from the pistol. (*Id.* at 1233-1235). Thomas Nicholson ("Nicholson"), the BCI firearms examiner who analyzed the pistol, determined that the pistol was a five-shot .38-caliber revolver. (*Id.* at 1381). Nicholson found five fired Winchester Western brand cartridge cases in the cylinder. (*Id.*). After cleaning, Nicholson found the revolver to be fully operational. (*Id.* at 1384). Nicholson test-fired the revolver and compared the test-fired rounds to the bullets collected from 128 East Grand and from the bodies of Sarah and Pelham. (*Id.* at 1384-1386). Nicholson concluded that three of the bullets, one of the bullets collected from 128 East Grand and the bullets removed from the bodies of Sarah

and Pelham, were fired from the barrel of the revolver recovered from Hover Pond. (*Id.* at 1396-1397). Although the other bullet collected from 128 East Grand was too damaged for Nicholson to make a definitive conclusion whether the bullet was fired from the recovered revolver, Nicholson found that the bullet was "similar[] in general rifling characteristics" to bullets fired from the revolver. (*Id.* at 1393).

{¶41} As part of their investigation, law enforcement officers also interviewed Alma at 685 North Union. In her interview, Alma stated that she kept a piece of pipe "out by the rear door of the apartment in case somebody tries to break in." (*Id.* at 900). Alma confirmed that she kept a length of pipe by the back door, which led into her kitchen. (*Id.* at 1012-1013). She testified that, at some point before her interview, she had discovered that the pipe was missing from its usual place and that she told the interviewing officer that the pipe was missing when he inquired about it. (*Id.* at 1012). Alma stated that she later saw the pipe that she kept by her kitchen door but that the pipe was not in the same condition as it was when she last saw it because "[o]ne end of it was broke off." (*Id.* at 1013). At trial, Alma identified the segments of pipe collected from 128 East Grand as pieces of the pipe she kept by her kitchen door, and she remarked that if one section of the pipe was "on to this end in this direction[,] this would be the pipe * * * that laid by [her] door." (*Id.* at 1017-1018).

{¶42} While at 685 North Union, law enforcement officers received permission to search Daniel's bedroom. A number of items were seized from Daniel's bedroom, including a pair of sunglasses, a blue stocking cap wrapped with black wire, a box containing a bottle of black leather shoe dye, a bottle of cologne, bed sheets, a pair of shoes, and a pair of brown pants. (Aug. 10-26, 1981 Tr. at 741-743, 827). In addition, a brown suede fleece-lined left-hand glove was discovered inside a trash bag. (*Id.* at 827). All of these items were submitted to BCI for testing, and small quantities of human blood were found on many of them. (*Id.* at 1269-1293). Specifically, blood was found on both legs of the brown pants and human blood was found near one of the rear pockets. (*Id.* at 1291-1293). At trial, James identified the brown pants as the pants Daniel was wearing when he and Ridley left 685 North Union at 11:35 a.m. on March 15. (*Id.* at 1091-1092). Human blood was also discovered on the glove found inside the trash bag. (*Id.* at 1271). BCI compared the left-hand glove collected from 685 North Union to the right-hand glove collected from 128 East Grand. (*Id.* at 1269-1270). After comparing the gloves' materials and their general appearances, BCI concluded that the gloves "could have been mates or parts of a pair." (*Id.* at 1269-1270). Numerous witnesses at trial testified that they knew Daniel to wear a pair of brown fleece-lined gloves and that the gloves recovered from 685 North Union and 128 East Grand were his gloves. (*Id.* at 908, 966-967, 1015, 1091). Finally, BCI compared the wire found

on the blue stocking cap in Daniel's bedroom at 685 North Union to the wire found wrapped around the hammerhead at 128 East Grand. (*Id.* at 1296-1305). Although BCI could not conclusively determine whether the lengths of wire had once been joined together, the examination revealed that the wires had identical characteristics. (*Id.* at 1303-1305).

{¶43} In addition, the State sought to establish that Daniel had a motive to carry out the attacks and that Ridley and Daniel were angry with Sarah around the time of the crimes. According to witnesses, Daniel lived with Sarah at 128 East Grand approximately one year before the crimes. (*Id.* at 719, 956-957). Witnesses testified that during the time that Daniel lived with Sarah, he took a .30-30 rifle that Sarah owned and pawned it. (*Id.* at 724, 959-961). When confronted about the rifle, Daniel promised to return it. (*Id.* at 960-961).

{¶44} Despite the tensions in their relationship, Daniel remained in contact with Sarah, and in early March 1981, Daniel performed a favor for Sarah. In the weeks before the crimes, Sarah and Pelham were planning on moving from 128 East Grand to a house on South Central Avenue in Lima. However, Sarah and Pelham owed the West Ohio Gas Company ("West Ohio") roughly $1200 in unpaid gas bills, and as a result, they could not turn the gas on at the South Central Avenue address without first paying off more than half of their indebtedness plus a $64 deposit. (*Id.* at 975). In an apparent effort to avoid paying some of this debt, Sarah

gave Daniel money for the deposit and asked that he put the gas account for the South Central Avenue address in his name.

{¶45} On March 6, 1981, Daniel went to West Ohio, applied for gas service at the South Central Avenue address, and deposited $64. (Aug. 10-26, 1981 Tr. at 977-978). However, on March 10, 1981, Daniel went back to West Ohio and asked that the $64 deposit be refunded. (*Id.* at 979, 983). A $64 check made payable to Daniel was prepared later that afternoon, which Daniel cashed at West Ohio. (*Id.* at 984-985). Ultimately, Pelham himself arranged to have the gas turned on at the South Central Avenue address after paying some of the money owing on the delinquent gas accounts. (*Id.* at 975, 985-986, 989-992).

{¶46} On the evening of March 13, 1981, a police detective went to 685 North Union to speak to Daniel "with reference to a police matter." (*Id.* at 940-941). Although Ridley and Daniel were upstairs when the detective arrived, Alma told the detective that Daniel was not there. (*Id.* at 998-999). After the detective left, Alma asked Daniel why the detective was looking for him. (*Id.* at 999-1000). Daniel responded that it was "probably because of a gas bill," that he had "it all except $10," and that he would "give that to them and she'll wait on the rest." (*Id.* at 1000). Daniel told Alma that he would reach out to the detective. (*Id.* at 999).

{¶47} However, James's testimony depicted Daniel and Ridley as responding much more angrily to the detective's inquiry. According to James, in a

conversation held outside of Alma's presence, "Ridley asked [Daniel] what did the man want with him. And [Daniel] told Ridley, probably about Sarah. Because he owed Sarah some money for the gas to be turned on and he never turned it on." (*Id.* at 1062-1063, 1100). In response, Ridley said, "What that bitch want to put the man on you for?" (*Id.* at 1063). Daniel then said, "I'll pay that bitch back her money somehow and pay her back too." (*Id.*).

{¶48} James also testified that he overheard telephone conversations between Ridley, Daniel, and Sarah about the gas deposit money. James stated that at approximately 1:30 a.m. on March 15, he heard Ridley say, "Sarah, [Daniel] got all but $6 of your money and all I want you to do is get the man off his ass." (Aug. 10-26, 1981 Tr. at 1064-1066). Later, Ridley and Daniel called Sarah again. (*Id.* at 1068-1069). During this phone call, Daniel said, "Sarah honey, I don't have all the money; I have all but $6 of it. * * * I would have brought it down to you earlier but I was scared you might hurt me." (*Id.* at 1069).

{¶49} Finally, the State offered evidence suggesting that there may have been a financial motivation for the crimes and that Ridley and Daniel were in control of a sizeable amount of money in the days following the crimes. Multiple witnesses testified that Sarah always kept large quantities of cash, sometimes over $1000, around 128 East Grand and on her person. (*Id.* at 713, 909-910, 955-956). Yet, aside from some loose change in Pelham's pocket, no money was found inside of

128 East Grand or on any of the victims. (*Id.* at 1364). In addition, as referenced earlier, the cab fare on the afternoon of the crimes was paid from a wad of money that Alberter described as being so big that "[h]e couldn't wrap his fingers around it." (*Id.* at 1125). Moreover, there was testimony that although Ridley was not employed at the time of the crimes, Ridley paid $15 to have his car towed and $112 for car repairs in the days after the crimes. (*Id.* at 1521, 1523-1524). Further, when Ridley turned himself into police, he had about $130 on his person. (*Id.* at 1593-1594).

{¶50} Ridley and Daniel vigorously disputed nearly every aspect of the State's theory of the crimes. First, Ridley and Daniel attempted to cast doubt on the State's estimated time of Sarah's, Pelham's, and Latrina's deaths. Dorothy McNeal ("McNeal"), Sarah's sister, testified that she had previously told investigators that she spoke to Sarah on the telephone at 11:30 a.m., 1:20 p.m., and 4:00 p.m. on March 15. (*Id.* at 1540-1542). Based on McNeal's statements, Ridley and Daniel contended that the State's estimated time of deaths, 8:00 a.m. to 12:00 p.m., were incorrect and that the crimes must have occurred sometime after the 4:00 p.m. telephone call. According to Ridley and Daniel, because McNeal's statement demonstrated that Sarah was alive at 4:00 p.m. and other testimony supported that they were nowhere near 128 East Grand at 4:00 p.m. or any time thereafter, they could not have committed the crimes. (*See id.* at 1489-1495, 1506-1507). However,

when pressed, McNeal stated that she was mistaken when she told investigators that she spoke to Sarah on March 15. (*Id.* at 1540, 1543, 1545). She repeatedly insisted that the telephone calls had actually taken place on March 14. (*Id.* at 1543, 1547-1548, 1553-1554, 1556, 1560).

{¶51} Ridley and Daniel also attacked the credibility of the State's most important witnesses. Ridley and Daniel testified that James was lying about the statements that they made after the detective left 685 North Union on the evening of March 13. (Aug. 10-26, 1981 Tr. at 1570-1571, 1622). They also accused James of lying about the telephone calls to Sarah in the early morning hours of March 15, the bloody shoe that fell out of Ridley's bag, the telephone calls Ridley made to James about the corner of East Grand and North Union, and the fact that Ridley threw a plastic-wrapped package into Hover Pond. (*Id.* at 1573-1574, 1581-1582, 1585, 1587, 1593, 1623-1624, 1635a-1637). Additionally, Ridley and Daniel both maintained that Flint was lying when he testified that he saw Daniel pull a pistol out from under a mattress and hand it to Ridley and when he testified that they talked about the gun at Wright's party. (*Id.* at 1590-1591, 1635-1636). Ridley and Daniel denied ever seeing a gun on the night of Wright's party. (*Id.* at 1591-1592, 1635-1636). Ridley and Daniel also insisted that James and Wright were either mistaken or lying when they testified to seeing Ridley and Daniel talking to each other in Wright's bathroom. (*Id.* at 1592, 1634a).

{¶52} Furthermore, to the extent that Ridley and Daniel conceded some of the facts of the State's case, they offered alternative explanations of the evidence. Daniel did not dispute that he kept the $64 that Sarah gave him for the gas deposit. However, he stated that Sarah had offered him $50 to place the deposit and that he went back to West Ohio to reclaim the deposit money only after Sarah failed to pay him. (*Id.* at 1610-1611, 1623). Although Daniel did not positively identify the glove found at 128 East Grand as his glove, he acknowledged that it looked similar to his glove. (*See id.* at 1639-1640). He explained that if the glove was his, it was found at 128 East Grand because he had left it in the house on March 6 when he went to get the gas deposit money from Sarah. (*Id.* at 1613). As for the glove found in the trash bag at 685 North Union, Daniel stated that he threw it away because he knew that he had lost its mate at 128 East Grand and that, given his deteriorating relationship with Sarah, it was unlikely that he would be able to reunite them. (*Id.*). In addition, Daniel claimed that any human blood found on the items in his bedroom at 685 North Union was sprayed onto those items from a hypodermic needle when he was injecting Preludin intravenously. (*Id.* at 1614-1615).

{¶53} Ridley and Daniel also admitted that James was generally correct when he testified that they left 685 North Union and came back a short time later on March 15, but they disagreed with some of the specific details. They testified that they left 685 North Union sometime after Alma went to church and that they

traveled south by foot. (*Id.* at 1579-1580, 1602-1603, 1627-1629). Daniel stated that they made it as far south as a junkyard before turning around, returning to 685 North Union, and calling the cab. (*Id.* at 1628-1629). Ridley estimated that the entire trip lasted 10-15 minutes. (*Id.* at 1607). Further, Ridley tried to clarify the comments he made to Wright on the evening of March 15. After explaining that he and Daniel had actually visited 128 East Grand the night before the crimes, Ridley testified:

> I had told [Wright] because I knew that I had been over there to Sarah's house and I knew that Daniel was supposed to have had some particular problem with her as far as some money was concerned and I knew I had been over there and so I had told [Wright], I said, if at any time that anybody come over and ask you if we had been over here I want you to tell them the truth because we had been by there early that day and by there that evening. I said I'm not asking you to lie, just tell the truth. And that's exactly the way it was.

(*Id.* at 1601). Ridley also confirmed that he, Daniel, Flint, and James stopped at Hover Pond after Wright's party and that he got out of the car to urinate, but he denied that he went anywhere near the water. (*Id.* at 1592-1593, 1603-1604).

{¶54} Lastly, Ridley and Daniel attempted to prove that another person, specifically James, was responsible for the crimes. Daniel testified that on the

evening of March 13, James was upset that the detective had come to 685 North Union. (Aug. 10-26, 1981 Tr. at 1644). According to Daniel, Alma was selling Preludin and other drugs from 685 North Union, a fact known to James. (*Id.*). Daniel stated that, after the detective left, James "made a statement that he would do something to that bitch," presumably referring to Sarah, "about sending the police around to [Alma's] house knowing she's doing what she's doing." (*Id.*). Moreover, Ridley and Daniel suggested that James was capable of carrying out the attacks because he practiced martial arts. (*Id.* at 1113-1115, 1645). They also pointed out that James had access to much of the evidence the State relied on, including the pipe taken from 685 North Union and the items collected from Daniel's bedroom, and that James was present at many of the key locations, such as Wright's house and Hover Pond. With respect to the events at Hover Pond, Ridley testified that when he exited the car to urinate, he left the door open. (*Id.* at 1604). He stated that he then heard the car door close and that when he returned to the car, James was "[a]djusting himself in his seat." (*Id.*). Nevertheless, despite Ridley and Daniel's efforts to implicate James, when cross-examined by defense counsel, James did not admit to committing the crimes, and he stated that he had "never met the people. [He] wouldn't know [Sarah] if you sat her right here in front of [him]." (*Id.* at 1121-1122).

{¶55} Having summarized the evidence presented at Ridley's 1981 trial, we turn now to the merits of Ridley's argument that the trial court erred by determining that an exclusion result would not have been outcome determinative. Ridley contends that the absence of his DNA from the items collected from 128 East Grand and from Hover Pond, coupled with the presence of another person's DNA, would "conclusively prove" that he did not murder Sarah, Pelham, and Latrina or attempt to murder Melvin. (Appellant's Brief at 8). He maintains that "[i]f one DNA profile is found on multiple items * * * that is neither [his] nor the victims', that profile would be that of the true perpetrator of the crimes" and this "'anchoring effect' would create a strong probability that a jury never would have convicted [him] had the results been available at the time of trial." (Id. at 9-10). Furthermore, he argues that "[i]f the profile that is found on these items were uploaded to [the combined DNA Index System ("CODIS")] and was found to be that of an individual with a history of committing similar crimes, the exonerative effect of the testing would be even stronger." (Id. at 8-9).

{¶56} Ridley's argument suffers from one fatal flaw, which stems from his overly expansive view of the types of DNA testing results that the trial court can consider when determining whether DNA testing would have been outcome determinative. As the postconviction DNA testing statutes make clear, the trial court is limited to a consideration of whether an exclusion result would have been

outcome determinative in the offender's trial. R.C. 2953.74(B)(1), (C)(4)-(5). "Exclusion" simply means a DNA testing result that "scientifically precludes or forecloses the *subject offender* as a contributor of biological material * * *." (Emphasis added.) R.C. 2953.71(G). *See* R.C. 2953.71(L) (the outcome-determinative standard involves a consideration of the "the results of DNA testing of the subject offender"). Therefore, an exclusion result *is not* a DNA testing result that excludes both the offender *and* other persons, such as victims, alleged accomplices, witnesses, or investigators, as the contributor of biological material. Likewise, an exclusion result *is not* a DNA testing result that both excludes the offender *and* establishes the identity of the contributor of the biological material. As a result, when determining whether a DNA testing result would have been outcome determinative, the trial court does not consider the probability that a reasonable factfinder would have found the offender guilty if the factfinder had been presented with a DNA testing result that either (1) excludes the offender and definitively identifies the source of the biological material or (2) rules out all persons known or alleged to be connected to the crime or the investigation. *Contra State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, ¶ 32-43 (8th Dist.) (noting that because R.C. 2953.71(L) "seems to make clear that an exclusion result is not the only factor to consider when deciding whether DNA testing will be outcome determinative," courts should also consider the effect that a DNA testing result

identifying the source of the biological material would have had on the outcome); *State v. Reynolds*, 186 Ohio App.3d 1, 2009-Ohio-5532, ¶ 19-21 (2d Dist.) (concluding that DNA testing would have been outcome determinative where "the absence of [the offender's] DNA and the simultaneous presence of a known felon's DNA from CODIS would create a strong probability of a different outcome"). Instead, the trial court must consider whether DNA testing would have been outcome determinative if the factfinder had been presented with a DNA testing result revealing only that the offender is not the source of the biological material.

{¶57} With the proper standard in mind, we conclude that the trial court did not abuse its discretion by determining that an exclusion result would not have been outcome determinative or by rejecting Ridley's application. In this case, the State theorized that Ridley and Daniel went to 128 East Grand together and jointly carried out the attacks on Sarah, Pelham, Latrina, and Melvin. However, while the State's case hinged on demonstrating that Ridley and Daniel were each involved in the crimes in some capacity, the State's case was not dependent upon proving their respective roles. In fact, at one point during closing arguments, the State's attorney essentially conceded that the State would not be attempting to prove exactly how the crimes unfolded. (*See* Aug. 10-26, 1981 Tr. at 1720). Therefore, the State's theory of the case was such that Ridley's participation in the crimes could have taken many different forms and still fit the State's theory.

{¶58} Although the State did not endeavor to prove the precise manner in which Ridley and Daniel committed these crimes, the State presented overwhelming circumstantial evidence of Ridley and Daniel's guilt. The State presented evidence showing that Daniel had some motive to attack Sarah based on the fact that she called the police after he kept the gas deposit money. The evidence also showed that Ridley shared in Daniel's displeasure with Sarah. Indeed, the evidence established that, in light of the extensiveness of her injuries, Sarah was likely the primary target of the assault. In addition, there was evidence that Ridley and Daniel were seen leaving from and coming back to 685 North Union, which was a short walk from 128 East Grand, during the time period that Sarah, Pelham, and Latrina likely died, and aside from Ridley and Daniel's self-serving testimony concerning their travels during this time, their whereabouts were unaccounted for. Further, evidence was presented that Daniel was seen leaving 685 North Union at that time wearing a pair of pants on which human blood was later found. Testimony also showed that Ridley and Daniel immediately changed their clothes after returning from their 30-minute absence from 685 North Union and that Ridley was then seen in possession of a shoe that appeared to be covered in blood. Human blood was also discovered on various items in Daniel's bedroom, including on a glove whose mate was discovered at 128 East Grand. Uncontroverted evidence established that the gloves were Daniel's. Other items of evidence also linked 685 North Union to 128

East Grand, including the sections of pipe found at 128 East Grand and the lengths of black wire. Additionally, shoe impressions discovered at 128 East Grand were determined to have been made by a pair of Converse All Star gym shoes, and evidence was presented suggesting that Ridley owned a worn pair of Converse shoes.

{¶59} Furthermore, the State offered evidence that Ridley was unusually concerned about the activities at the corner of North Union Street and East Grand Avenue on the afternoon of the crimes and that Ridley seemingly attempted to fabricate an alibi by requesting that an acquaintance vouch for his whereabouts on the day of the crimes. Finally, the State presented evidence that on the night after the crimes, Daniel was seen handing Ridley a pistol wrapped in cloth and Ridley was seen throwing a plastic-wrapped package into Hover Pond, which was later found to contain the revolver that fired the bullets collected from 128 East Grand and from the victims' bodies. Thus, the State established a direct connection between Ridley and the gun used in the crimes.

{¶60} Even assuming that the DNA testing requested by Ridley would yield an exclusion result, we believe that there is not a strong probability that no reasonable factfinder, when considering the exclusion result in the context of and upon consideration of the abundance of circumstantial evidence tying Ridley to the crimes, would have found Ridley guilty. Ridley was alleged to have carried out

these crimes in concert with Daniel, his exact role was uncertain, and proof of his exact role was unessential to the State's case. With the exception of three items of evidence—the piece of linoleum, the revolver, and the spent shells found in the revolver—the absence of Ridley's DNA and the presence of another person's DNA on the items he wishes to test would establish only that someone else interacted with those items during the commission of the crimes. *See Sells*, 2017-Ohio-987, at ¶ 10. Given the high degree of flexibility in the State's theory of the case, a DNA testing result proving that another person interacted with these items would not foreclose Ridley as a perpetrator of the crimes because, in light of the considerable circumstantial evidence, a reasonable factfinder could find that Ridley participated in the crimes in some way but that an accomplice—specifically Daniel—touched or used these items. *See id.* Hence, contrary to Ridley's argument, the absence of his DNA on most of the items would not "conclusively prove" that he did not take part in the attacks on Sarah, Pelham, Latrina, and Melvin.

{¶61} However, the absence of Ridley's DNA on the piece of linoleum, the revolver, and the spent shells could have significance beyond merely establishing that someone else interacted with these items. Of the items that Ridley wants to test for DNA, these three items were the items to which Ridley was most directly connected. The State offered evidence showing that shoe impressions found on the linoleum floor in the kitchen of 128 East Grand were made by a Converse All Star

gym shoe, and it presented testimony suggesting that Ridley owned a pair of Converse shoes. In addition, Flint's testimony and James's testimony tied Ridley directly to the revolver that was determined to have been used in the crimes. Accordingly, the absence of Ridley's DNA on these items could conceivably (1) lessen the likelihood that Ridley was the person who made the shoe impressions and (2) call into question the veracity of Flint's and James's accounts linking Ridley to the revolver.

{¶62} Yet, from the available record, we do not believe that the absence of Ridley's DNA on these three items would meaningfully alter a reasonable factfinder's assessment of the evidence. First, the record reflects that BCI made its shoe tread identification from photographs of the kitchen floor at 128 East Grand. There is nothing in the transcript of Ridley's trial demonstrating conclusively that the piece of linoleum Ridley wants to test was depicted in these photographs or that the piece of linoleum was in fact used to make the identification. Therefore, in light of the available evidence, the absence of Ridley's DNA on the piece of linoleum would not diminish Ridley's connection to the crime scene as established by the shoe tread identification because the transcripts do not support, with sufficient certainty, that the linoleum Ridley wants to test is the evidence that linked him to the crime scene.

{¶63} Likewise, the absence of Ridley's DNA on the revolver or the spent shells likely would not have destroyed Flint's and James's credibility. According to Flint's testimony, when he saw Daniel hand Ridley the pistol, it was covered by some sort of cloth. While Flint's testimony establishes that he came into possession of the pistol before going to Wright's party, Flint's testimony does not reveal the identity of the person who handed him the pistol or whether the pistol was wrapped in the cloth when he received it. Similarly, although Flint testified that he saw Ridley at the party carrying the plastic-wrapped package that contained the revolver, Flint did not testify that he saw Ridley remove the revolver from the work coat in Wright's bathroom closet or that he saw Ridley wrap the revolver in the packaging in which the revolver was later found. In addition, James's testimony tied Ridley to the plastic-wrapped package thrown into Hover Pond, but James did not testify to seeing Ridley touch the revolver directly. James's testimony established only that Ridley touched the outer plastic layer of the package. Thus, notwithstanding the absence of Ridley's DNA on the revolver or the spent shells, a reasonable factfinder could fully credit Flint's testimony and James's testimony connecting Ridley to the revolver because the testimony did not show that Ridley had direct contact with the weapon.

{¶64} In sum, we concur with the trial court that if an exclusion result were obtained from the items Ridley wishes to test for DNA and if that exclusion result

was analyzed in the context of and upon consideration of all available admissible evidence related to Ridley's case, there is not a strong probability that no reasonable factfinder would have found Ridley guilty. Therefore, we conclude that the trial court did not abuse its discretion by determining that an exclusion result would not have been outcome determinative in Ridley's 1981 trial. Accordingly, the trial court did not abuse its discretion by rejecting Ridley's application for postconviction DNA testing.

{¶65} Ridley's assignment of error is overruled.

{¶66} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**