[Cite as *State v. Harwell*, 2022-Ohio-2706.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | |
|---|---|
| STATE OF OHIO | : |
| | : |
| Plaintiff-Appellee | :   Appellate Case No. 29318 |
| | : |
| v. | :   Trial Court Case No. 2012-CR-2367 |
| | : |
| MICHAEL D. HARWELL | :   (Criminal Appeal from |
| | :   Common Pleas Court) |
| Defendant-Appellant | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of August, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

MICHAEL D. HARWELL, #A687-427, London Correctional Institution, P.O. Box 69, London, Ohio 43140
    Defendant-Appellant, Pro Se

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Michael D. Harwell appeals from the Montgomery County Court of Common Pleas' order denying his application for post-conviction DNA testing. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.    Facts and Procedural History

{¶ 2} The following facts are taken from this Court's opinion in Harwell's direct appeal, *State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966.

{¶ 3} On June 14, 2012, Jonathon Lambes and Jason Miller met at Lambes's house to set up a potential drug deal. The following day, June 15, 2012, Miller came back to Lambes's residence with a man called "B," later identified as Harwell. After the meeting, Miller called Lambes to arrange a sale of two ounces of cocaine to "B."

{¶ 4} Following the request, Lambes contacted his supplier, Lori Peak, to see if she was willing to do business with "B." According to Peak, Lambes asked her to remove three grams from the two ounces of cocaine as a "finders fee" and replace it with baking soda. Peak did as Lambes requested and testified that the cocaine she sold was a 70/30 cut, meaning it was 70 percent cocaine and 30 percent baking soda, fish scale, or creatine.

{¶ 5} After Peak agreed to meet "B," Lambes testified that "B" picked him up at his house and drove him to Peak's residence. When the two men arrived, other people were present at the house, including Peak's children and her own supplier. Peak testified that she gave "B" two ounces of cocaine in exchange for $2,400 in cash. "B" asked Peak if she "cut" the cocaine, to which she replied "no." Following the transaction, Peak and "B" exchanged numbers, and after "B" and Lambes left, Peak noticed that "B" was driving a

white pickup truck with lettering on the doors and a ladder and ladder rack in the back of the vehicle. Lambes also testified that "B" drove a white truck with a company name on the doors. Another male was spotted in the passenger seat of the truck, but he never went inside Peak's home.

{¶ 6} After concluding the drug deal at Peak's home, Lambes testified that "B" dropped him back off at his house and told him he "had just made a friend." Trial Tr. at 764. Later that day, however, "B" called Peak to demand his money back because he was unable to cook the two ounces of cocaine into crack. Peak told the jury that "B" threatened to "shoot up [her] house" and kill her children if she did not return the money. Trial Tr. at 1002. Around that same time, Lambes returned to Peak's house to pick up some more cocaine and observed Peak having an angry phone conversation with "B." After the call ended and Peak explained what had happened, Lambes called "B" multiple times to calm him down and work things out. However, Lambes recounted that "B" continued making threats and said he was going to "shoot up the house" if his money was not returned. Trial Tr. at 773.

{¶ 7} Based on the threats, Peak gathered her children and, along with Lambes, dropped them off at her aunt's house. Once they returned home, Peak contacted Kevin, her supplier, who came over with an unknown male and female. Both Peak and Lambes testified that Kevin was armed. Understanding the severity of the situation, Lambes began calling family and friends for money.

{¶ 8} "B" came back to Peak's house later that night. Lambes testified that "B" and Kevin had a discussion in which Kevin placed the blame on Lambes. After Kevin informed

"B" that he would not be reimbursing the money, "B" asked Lambes if he had it. In response, Lambes told "B" that he could get the money, but they would have to drive to a place near Indian Lake to retrieve it. Lambes told the jury that "B" then walked him out to "B's" white truck, and once inside, noticed that a gun lay in between them, and that "B" kept his hand on the gun as they drove away. After departing, Lambes asked if they were going to Indian Lake, to which "B" responded "no" and that "he's not going out there to get set up." Trial Tr. at 783. "B" then took Lambes's cell phone.

{¶ 9} "B" drove Lambes to a Domino's Pizza at the corner of Airway and Smithville Roads. Lambes told the jury that when they arrived, a purple car pulled up and two or three men walked up to the truck, one of them being the passenger Lambes had seen in "B's" truck earlier that day. While at Domino's, Lambes used "B's" phone to call his mother, but he was unable to come up with any money. "B" then made several calls, including one to Miller, who he instructed to meet them on the corner of Huffman Avenue and John Street.

{¶ 10} Melissa Mesarosh, a friend of Miller, was with Miller when he received a call from someone named "B." According to Mesarosh, Miller seemed nervous on the phone and told the person on the other line: "Well, don't hold this against me, I didn't have anything to do with it, that's why I set you two up and I * * * wasn't involved." Trial Tr. at 1286. Miller then told Mesarosh that "a 'B' guy had his dude held hostage over some money[.]" Trial Tr. at 1287. She further explained that Miller was scared to go to John Street because he thought they were going to kill him. Mesarosh asserted Miller left despite this fear and that she never heard from him again.

{¶ 11} Miller's fiancé, Emily Kincaid, told the jury that at approximately 11:20 pm she received a text message from Miller saying "Come to John. If I'm dead, they killed me." Trial Tr. at 1348. Kincaid took a photograph of the message, and it was admitted as evidence. She further stated that she had on many occasions transported Miller to the John Street location and she would oftentimes see a white truck and a purple car there.

{¶ 12} When "B" and Lambes arrived at John Street, Lambes testified that he was told not to run. He asserted that on the way, "B" threatened him, and as a result, he stayed in the vehicle for fear of being shot and killed. Lambes then observed "B" walk over to the same purple car that was at Domino's and noticed Miller approaching. "B" walked up to Miller, patted him down, and pulled something from his waist band. Miller was then led to "B's" truck and placed in the back seat. Lambes claimed he had no idea where "B" was taking them.

{¶ 13} While they were driving, Miller began to pick a fight with Lambes, calling him names and hitting him in the back of the head. Lambes told the jury that Miller offered to "do him in" and asked "B" for a gun. Trial Tr. at 795. Lambes also recalled "B" telling Miller, "If you don't kill [Lambes] I'm a kill both y'all." Trial Tr. at 797. Shortly thereafter, the truck pulled off the highway, parked, and Lambes and Miller were told to get out of the vehicle. Lambes recalled that, when they walked to the back of the truck, he saw the man who rode as "B's" passenger earlier in the day exit the purple car holding a 9 millimeter pistol.

{¶ 14} Lambes testified that "B" approached him and pushed him to the ground. Lambes then stated that he got up and took off running into the woods. As he was running,

Lambes heard four to five gunshots, a short pause, and then two more gunshots, a scream, and then a couple more shots.

{¶ 15} While running through the woods, Lambes fell and hit his head. He also stated that he ran out of his shoes and began crawling with no idea where he was. Eventually, Lambes emerged from the woods and came to a house. He testified that he pounded on the door, but no one answered. He then saw another house and did the same, but again, no one answered. Phyllis Rose, a resident of one of the houses, told the jury that on the night in question, someone pounded on her door at approximately 11:55 p.m., but she did not answer it because her husband was not home.

{¶ 16} Lambes then ran toward a golf course where he saw a light off in the distance; the light ended up being the 19th Hole Karaoke Bar. There, a patron let Lambes use his phone to call his mother and then gave Lambes a ride to the Kroger on Smithville where his mother picked him up.

{¶ 17} As for Miller, at 12:14 a.m. on the morning of June 16, 2012, a 911 call was placed by a passerby alerting the police to a body lying on the 3500 block of Guthrie Road. Officer David House testified that when he arrived on scene, he found Miller's body lying unresponsive in a large pool of blood, and medics pronounced him dead at the scene. Forensic pathologist Dr. Robert Shott testified that Miller's death was caused by multiple gunshot wounds to his head, leg, arms, and abdomen.

{¶ 18} Evidence technician John Malott conducted a search of the crime scene and discovered four 9-millimeter cartridge casings as well as three plastic baggies containing cocaine and heroin. Further inspection of the area uncovered a fifth casing.

Chris Monturo, an expert witness from the Miami Valley Regional Crime Lab, testified that the five cartridge casings were fired from two separate guns.

{¶ 19} Lead detective Rebecca Rasor testified that, during her investigation, Lambes, Peak, and Angela Stark (a friend of Peak's who was at her house when Harwell came over) all identified Harwell as being the man they knew as "B." Detective Rasor also obtained phone records from Lambes and Miller which confirmed that Harwell's phone had contacted or received calls from Miller's phone 11 times on June 15. The State also presented FBI special agent Kevin Horan, a cellular analyst, who testified that Harwell's phone was within the vicinity of the cell tower near the crime scene.

{¶ 20} Further, Detective Rasor testified that she obtained BMV records establishing that Harwell owned a white pickup truck at the time of the murder, and a clerk from the Montgomery County Auto Title Department stated that a duplicate title was issued for Harwell's truck four days after the murder. The clerk also told the jury that the truck was transferred to a man named Jeffery Washington on September 29, 2012. Lambes, Peak, and Stark all identified a photo of Washington's truck as the one driven by Harwell on June 15, 2012.

{¶ 21} In his defense, Harwell attempted to establish an alibi through the testimony of his neighbor, Demetrice Norris. Norris claimed that on June 15, 2012, he saw Harwell at his house on Lexington Avenue around 10:00 pm, but Norris could not account for Harwell's whereabouts at the time of the abductions and shooting.

{¶ 22} On November 16, 2012, Harwell was indicted on two counts of murder; two counts of attempted murder; kidnapping (terrorize/physical harm); kidnapping (restrain),

two counts of kidnapping (felony or flight); two counts of felonious assault (deadly weapon); one count of felonious assault (serious physical harm); and one count of having weapons under disability. All the counts, except for having weapons under disability, had three-year firearms specifications attached.

{¶ 23} Following a July 2013 jury trial, Harwell was found guilty of the first 13 counts and, subsequently, the trial court found him guilty after a bench trial of having weapons while under disability. After merging some of the offenses, the court sentenced Harwell to an aggregate prison term of 32 years to life. On appeal, Harwell's attempted felony murder convictions were vacated as a result of *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, and the matter was remanded for resentencing, where he again was given an aggregate term of 32 years to life in prison.

{¶ 24} Between 2015 and 2021, Harwell filed multiple unsuccessful challenges to his conviction. On May 4, 2021, he filed an application for post-conviction DNA testing with the trial court, as he wanted cartridge casings and Lambes's t-shirt checked for "touch DNA." On November 4, 2021, after briefing from both sides, the trial court denied Harwell's application for post-conviction DNA testing, reasoning that he had failed to meet the criteria set out in R.C. 2953.74(B)(1). The court also held that his application failed to meet the criteria listed in R.C. 2953.74(C), specifically that Harwell's identity was not at issue during the trial, and therefore the DNA testing would not be outcome determinative.

{¶ 25} Harwell appeals the trial court's judgment and raises three related assignments of error.

## II.    Post-Conviction DNA Testing

{¶ 26} Harwell has raised three separate assignments of error: (1) the trial court misapplied the law by relying on the wrong section of R.C. 2953.74 when it determined that his post-conviction DNA application should be denied; (2) the trial court erred by denying his request for DNA testing; and (3) the trial court abused its discretion when it found he had failed to meet the requirements of R.C. 2953.74(C) because multiple suspects could have committed the crime. His claims can be distilled down to one: the trial court erred by denying his application for post-conviction DNA testing. We disagree.

{¶ 27} Since 2003, Ohio has given those convicted of certain crimes the ability to have post-conviction DNA testing performed, recognizing that DNA technologies have rapidly advanced, allowing for more accurate and sophisticated results than were previously possible. *See* Am.Sub.S.B. No. 11; Am.Sub.S.B. No. 262; Am.Sub. S.B. No. 77; *see also* former and current R.C. 2953.71 through R.C. 2953.83. Ohio courts have acknowledged this, noting "the law's never-ending quest to ensure that no innocent person be convicted." *State v. Emerick*, 2d Dist. Montgomery No. 24215, 2011-Ohio-5543, ¶ 31.

{¶ 28} Under R.C. 2953.74(B)(1), an eligible offender (there is no dispute that Harwell was eligible) may apply for post-conviction DNA testing if he or she did not have a DNA test at trial. The court may accept the application only if the offender "shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case * * * would have been outcome determinative at the trial stage, * * * and at the time of the trial, * * * DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence,

or DNA testing was not yet available." R.C. 2953.74(B)(1).

{¶ 29} "Outcome determinative" means that "had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible" with respect to the offense for which the offender was convicted and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case, "there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense." *State v. Hughes,* 2d Dist. Montgomery No. 27433, 2017-Ohio-8250, ¶ 18; R.C. 2953.71(L). A trial court's decision whether a result would be outcome determinative is reviewed for an abuse of discretion. *State v. Sells*, 2017-Ohio-987, 86 N.E.3d 891, ¶ 5 (2d Dist.); *see also State v. Bunch*, 7th Dist. Mahoning No. 14 MA 168, 2015-Ohio-4151, ¶ 94.

{¶ 30} In this case, the trial court found that Harwell failed to satisfy multiple sections of R.C. 2953.74. R.C. 2953.74(B)(1) applies when DNA testing was not utilized at trial, and both parties concede that no testing of the subject evidence was performed prior to the 2013 proceeding. Therefore, for Harwell to be successful, he would have to establish one of several important facts: (1) that DNA testing was not generally acceptable in 2013; (2) the results of DNA testing were not generally admissible; or (3) that DNA testing was not yet available. In addition, Harwell would have to demonstrate that the results would have been outcome determinative.

{¶ 31} Harwell argues that while DNA testing was generally accepted and available in 2013, "[t]he use of touch DNA was still not completely accepted by the courts or the

scientific community." Appellant's Brief at 15-16. He tries to cast doubt on the general acceptability of "touch DNA" specifically by citing cases from other states (which were all decided before his trial), but even if the cases were persuasive, his argument was not raised below, and therefore he is foreclosed from raising it for the first time now. *See State v. Auerswald*, 9th Dist. Medina No. 18CA0033-M, 2019-Ohio-1148, ¶ 9. Further, in his memorandum to the trial court, he admitted that "at the time [of trial] DNA testing was generally accepted and available. Touch DNA and STR-DNA had been around for several years, since roughly 2007." Defendant's memorandum contra at 6. His argument below is self-defeating now.

{¶ 32} Even though the trial court did not need to go any further – it was correct in denying Harwell's application based on his inability to meet the requirements of R.C. 2953.74(B)(1) – it also explained that his application would fail under R.C. 2953.74(C).

{¶ 33} Under R.C. 2953.74(C)(3), the trial court may only accept an application for DNA testing if, "at the trial stage * * *, the identity of the person who committed the offense was an issue." As the State points out, it was not. Harwell was convicted as the principal and/or aider and abettor under a complicity theory; there were two men involved: Harwell and the man in the purple car. After he escaped and was interviewed by the police, Lambes identified Harwell in a photo spread as being involved in the kidnapping and shooting, and then at trial, Lambes acknowledged him as the perpetrator. Lambes also testified that he was "not going to forget who drove me around for a couple hours of my life just to take me somewhere just to have me done in. I'm not going to forget that face[.]" Trial Tr. at 872.

{¶ 34} Both Peak and Stark also identified Harwell in a photo spread and at trial. Peak recalled that Harwell bought drugs from her that day, that he was angry he could not "cook" his cocaine, and that Lambes left her house with Harwell in a white truck. Stark also testified that Harwell was at Peak's house and that he drove a white truck.

{¶ 35} Cell phone records indicated that Harwell was involved. Not only did he make multiple calls with witnesses and victims during the ordeal, but evidence was presented that his cell phone was at or around Guthrie Road at the time of the shooting. The trial court did not err by denying his application on the authority of R.C. 2953.74(C)(3).

{¶ 36} The trial court also found that Harwell's application would fail under R.C. 2953.74(C)(4), which states that the exclusion result must be outcome determinative. Outcome determinative means that had the results of DNA testing of the offender been presented at the trial, there is a strong probability he would not have been found guilty. There was ample evidence to convict.

{¶ 37} Even if we accept Harwell's theory that testing the casings and Lambes's t-shirt would have yielded a result establishing the presence of another's DNA, that sort of result would not be outcome determinative. Rather, it would merely establish that someone else touched the cartridge casings and had contact with Lambes. It would not negate the substantial amount of credible evidence of Harwell's involvement in the kidnappings and murder. *See State v. Moten,* 2d Dist. Greene No. 2005-CA-5 and 2020-CA-23, 2021-Ohio-233; *State v. Sells*, 2017-Ohio-987, 86 N.E.3d 891 (2d Dist.); *State v. Mason*, 5th Dist. Ashland No. 2020CA00023, 2020-Ohio-6895, ¶ 47-48 ("[I]n order for the trial court to find that touch DNA evidence on the clothing would be outcome

determinative, it would have to disregard all the evidence provided at trial."); *State v. Ridley*, 2020-Ohio-2779, 154 N.E.3d 462, ¶ 60 (3d Dist.) ("Given the high degree of flexibility in the State's theory of the case, a DNA testing result proving that another person interacted with [the] items would not foreclose Ridley as a perpetrator[.]").

{¶ 38} The trial court did not err by denying Harwell's post-conviction request for DNA testing because he could not satisfy R.C. 2953.74(B); touch DNA testing was available, accepted, and admissible at the time of his trial. The requirements of R.C. 2953.74(C) could not be met because identity was not at issue and the exclusion results would not have been outcome determinative. Harwell's three assignments of error are overruled.

### III.    Conclusion

{¶ 39} The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Michael D. Harwell
Hon. Mary L. Wiseman